**IN THE UNITES STATES DISTRICT COURT**
**FOR THE NOTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Suresh  Sharma , | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  2017-cv-7378 |
| v. | ) | |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | Jury Demanded |
| UNIVERSITY OF ILLINOIS | ) | |
| Defendant. | ) | |

### <u>COMPLAINT</u>

Suresh Sharma, (Plaintiff) by and through his attorney, Jorge Sanchez, for his

Complaint against the Board of Trustees (Defendant) states as follows:

### <u>INTRODUCTION</u>

1. This lawsuit arises Title VII (42 U.S.C. §2000(e)(1)) et seq. and is brought for

   violation of Mr. Sharma right to be free from discrimination in employment

   on the basis of disability, national origin, and race. Defendant required Mr.

   Sharma, on penalty of termination, to submit to an unjustified and

   outrageous demand for a medical and psychological evaluation based on

   absolutely no conduct or performance issues which would call for such

   treatment and with nothing other than the most positive and exceptional

   performance reviews and  no derogatory information in his personnel file.

2. At least two other similarly situated white men who, contrary to Mr.

   Sharma's behavior and performance, did in fact have multiple instances of

   inappropriate communications and interactions with  UIC personnel were

   never required to submit to medical or psychological examinations, and

instead of being terminated, were offered significant payments upon their separation with UIC.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. §1331. Venue is proper in this judicial district as the facts and events giving rise to Plaintiffs' claims occurred in this judicial district.

## THE PARTIES

4. Plaintiff Suresh Sharma is an individual who resides in Bolingbrook, Illinois, within this judicial district, his race is Asian and his national origin is Indian.

5. Mr. Sharma was hired by the University of Illinois Chicago campus (UIC), Office of the Dean, College of Urban Planning and Public Affairs ("CUPPA") in July 2005 as a Business and Financial Systems Specialist. Mr. Sharma received numerous promotions and positions he applied for within UIC to reach the position, Director of Administrative Operations for the Department of Pediatrics, he was notified of his discharge on June 28, 2016 which became effective on July 20, 2017.

6. The Defendant, U of I, (including University of Illinois's Chicago campus College of Medicine), is a public university within the State of Illinois university system.

**FACTS**
**Employment History and Commendations:**

7. Mr. Sharma was hired by the University of Illinois (Chicago campus, (College of Urban Planning and Public Affairs), Office of the Dean, College of Urban Planning and Public Affairs ("CUPPA") in July 2005 as a Business and Financial Systems Specialist.

8. Mr. Sharma was promoted to Director and Budgeting and Financial Analysis for CUPPA in May 2007.

9. Mr. Sharma applied for and received the position of Director of Finance for the College of Medicine, Department of Pediatrics ("UIC") in June 2008.

10. In 2009, Mr. Sharma volunteered and assumed the additional roles and responsibilities of two vacant positions of Executive Director and Human Resources Director in order to ensure that there would be no disruption in the business operations of the Department because of a hiring freeze.

11. In December 2010, UIC interviewed and offered Mr. Sharma the position of Director of Administrative Operations for the Department of Pediatrics.

12. When he applied for this new Director position he received numerous letters of recommendation from the people he worked with in the Department of Pediatrics.

13. Mr. Sharma received written recommendations from Dr. Saul Weiner, currently Vice Provost, Planning who noted Mr. Sharma's "proven track record of success;" his "major role in organizing, managing, and stabilizing the finances in the Department of Pediatrics;" his "mastery of the intricacies of health care finance;" and his "impressive credentials and certification for

3

finance leadership and management." He also described him as "highly dedicated" "fair and ...respected by the administrative staff who report to him;" "calm and thoughtful in addressing personnel issues that arise;" and "discrete and professional at all times."

14. From December 2010, until July 17, 2015 Mr. Sharma was employed as the Director of Administrative Operations for the Department of Pediatrics.

15. Throughout Mr. Sharma's tenure with UIC, he has excelled in every position as demonstrated by his receiving 35 to 36 out of 36 on all of his yearly performance reviews since year 2005 and his performance was found to be outstanding and to exceed expectations.

**Reporting UIC for Bad Debts Expense**

16. On May 01, 2011, Defendant appointed Dimitri Azar as the Interim Dean of the College of Medicine.

17. In 2013, Mr. Sharma reported a concerning issue regarding UIC's financial statements.

18. Mr. Sharma noticed that the bad debts expense had increased in Fiscal Year 2012 (the year Dimitri Azar took over as the Dean) by approximately $1,000,000 compared to earlier years.

19. Mr. Sharma began to investigate and determined that UIC was recording bad debts expenses for the department of Pediatrics at a very high dollar amounts, incorrectly stating the year end operating statements.

20. Mr. Sharma reported this issue to his immediate supervisor at the time, Dr. Usha Raj, head of the department of Pediatrics.

4

21.    The issue was later brought to the attention of several individuals in an April 2013, meeting including Todd Van Neck, who was at the time the Associate Dean for Administration and Finance.

22.    Mr. Sharma was later told by a colleague, Mr. Marc Archambeau, Director of Finance & Chief Accountant, Ambulatory, that Mr. Van Neck and others in the Dean's office did not like that Mr. Sharma had brought out this issue because it was making them look bad.

23.    Mr. Archambeau warned Mr. Sharma to be careful because Todd Van Neck and Dean Dimitri Azar bad mouthed and intended to terminate him on this issue.

24.    Mr. Sharma brought this to the notice of Dr. Usha Raj as he felt that he was doing his job and strongly felt that this statement was against employment policies.

25.    Dr. Raj told him that as his immediate supervisor she felt that he was doing a good job for the department, the College of Medicine and the University so he should continue to perform in the same way.

26.    During this time on July 17, 2013, Dr. Raj gave Mr. Sharma a performance evaluation of 35/36 and approved a 7% merit raise which was within the approval authority of the department head.

27.    Defendant decreased the raise to 3%.

28.    In August 2013, Dr. Raj told Mr. Sharma, in response to Mr. Sharma's inquiry, told him that she was informed by Todd Van Neck and Marci Fanti (who

reported to Todd Van Neck in the Dean's Office) that he was being punished for raising the bad debts issue.

29.     During this time, Mr. Van Neck and individuals who reported to him began retaliating against Mr. Sharma by pinpointing certain alleged faults and making his day to day operations difficult.

30.     Despite the increased harassment and retaliation, in January 2015, UIC determined that the codes used to classify bad debts versus insurance adjustments were outdated, and the formula was classifying contractual adjustments as bad debts as Mr. Sharma had pointed out. The coding practice was changed to correct this as a result.

31.     During this time, Marc Archambeau again warned Mr. Sharma that the College of Medicine felt he was a troublemaker and that he needed to be terminated.

32.     Mr. Sharma was performing his job responsibilities as assigned to him by the department head, Dr. Usha Raj with integrity, objectivity and distinction and failed to understand the lengths his superiors would go to discredit him and terminate him.

### Other Refusals to Comply with Orders that Violated Policies, Procedures and/or the law

33.     In January 2015, Mr. Sharma refused to approve certain travel arrangements in connection with a contract Dr. Van Voorhees was working to procure with a vendor, Clear Tec Solutions.

34.     Dr. Van Voorhees wished to travel to Tampa with a team of employees to meet with the vendor, even though the prospective contract exceeded the no bid

6

limit, and was not brought to the attention of the Pediatrics Business Office and the

UIC Purchasing Department for approval.

35.     Mr. Sharma refused to authorize the travel arrangements because he

believed it constituted a violation of University and Departmental policies,

procedures and protocols.

36.     Written correspondence demonstrates that Dr. Van Voorhees and

other individuals were actively attempting to circumvent these policies and

procedures and Mr. Sharma's efforts to ensure compliance with these as per his job

duties.

37.     In February of 2015, by Dean Dimitri Azar removed Dr. Usha Raj as

Head of the Department of Pediatrics

38.     In February of 2015, Dean Dimitri Azar appointed Dr. Benjamin Van

Voorhees as interim Department Head of Pediatrics.

39.     In March and April 2015 Mr. Sharma applied and interviewed for the

position of Associate Dean for Administration and Finance in the College of

Dentistry, but he was not selected.

40.     On March 04, 2015, Mr. Sharma refused to authorize improper payroll

payment requests by Dr. Voorhees in connection with services provided to Dr.

Voorhees by Ms. Hema Pokharna, a life empathy coach.

41.     Dr. Voorhees insisted that Mr. Sharma make the payments to Dr. Van

Voorhees' life coach. Mr. Sharma believed the request to be illegal, a violation of

University Payroll Policies, a violation of state and federal tax laws, and ethical

policies and procedures, and so in keeping with his duties told Dr. Vorhees that he could not approve the request.

42.     If Mr. Sharma had complied he would have violated policy and laws because the University/department would have been reimbursing Ms. Pokharna for payroll deductions (taxes etc.) that were withheld from her paychecks, and paying her for unauthorized overtime.

43.     From May – July 1, 2015, Dr. Van Voorhees asked and then repeatedly pressured Mr. Sharma to retrospectively transfer funds to his grant for a time period of 8 months before he took over as Department Head.  Mr. Sharma refused as he believed it to be a misappropriation of funds and a violation of Fund Accounting/UIC and state ethical rules, laws, protocols and procedures and consequently, in violation of his job duties.

44.     On the morning of Wednesday, April 22, 2015, Dr. Van Voorhees forcefully dragged Mr. Sharma to his office in front of Dr. George Hoganson, division chief of Genetics.  Mr. Sharma was in a preliminary FY16 budget meeting with Dr. Hoganson.

45.     Dr. Van Voorhees and Dr. Mary Lou Schmidt pressured Mr. Sharma to process a $10,000 salary increase for Laura Ravens immediately.

46.     From May – July 16, 2015, Van Voorhees pressured Mr. Sharma to pay $10,000 increase in salary to Laura Ravens (increasing her salary from $43,000 to $53,000) bypassing the protocol of University's internal pay equity process.

47.     Mr. Sharma agreed to do it, but told the two that he wanted to follow the internal pay equity process to prevent potential lawsuits by other coordinators

whose workload, responsibilities, and seniority were greater than Laura Ravens'. Mr. Sharma told Van Voorhees about a discrimination complaint filed by Andrea Reimer, former Project Coordinator of division of Endocrinology, in October 2011 regarding pay inequity. In that case, because the department had followed the protocols and was compliant with the pay equity policies, there was no liability found. Mr. Sharma wanted to avoid such a claim and liability by asking that the two adhere to University pay equity procedures.

### **Aftermath of Reporting**

48.     From March – May 2015, Dr. VanVoorhes, instead of filling vacant positions , hired two Caucasian Consultants to work in the Department of Pediatrics: Juanita LeCrone, Human Resources Consultant, and Meg Oberholtzer, Administrative Operations Consultant.

49.     The two new hires yelled at Mr. Sharma on several occasions.

50.     Juanita Lecrone bullied and yelled Mr. Sharma in his office on April 16, 2015, in his office following a meeting regarding managing the budget for Residency and Fellowship programs held in Dr. Van Voorhees's office.

51.     Meg Oberholtzer yelled at Mr. Sharma in the Financial Group meeting on April 30, 2015, with Dr. Benjamin Van Voorhees, Dr. Hampasandra Madan Kumar, Mary Lou Schmidt, and Juanita Lecrone.

52.     Mr. Sharma verbally complained to Mr. Nivid Thakar, Pediatrics Human Resources, regarding Ms. Oberholtzer's behavior in this meeting.

53.     Nivid Thakar in turn confirmed with Mr. Sharma that he also learned from Juanita Lecrone regarding Ms. Oberholtzer's behavioral issues in the April 30, 2015 meeting.

54.     Mr. Sharma then complained of their inappropriate behavior and the abusive and hostile work environment Ms. Lecrone and Ms. Oberholtzer were creating to Dr. Benjamin Van Voorhees.

55.     No remedial action was taken.

56.     From May – July 2015 – Mr. Sharma attempted to engage the Office of Access and Equity (OAE) for Dispute Resolution, but he was told there was no retaliation.  Mr. Sharma was surprised to know the decision since he never filed a retaliation complaint with OAE.

**Continuing Excellent Work by Mr. Sharma**

57.     From June – July 2015 Mr. Sharma was performing complex financial tasks such as zero based budgets and presentations to groups of colleagues and was complimented on his work performance by his supervisor and colleagues.

58.     On June 16, 2015 Jordan Hupert, Division Chief of General Pediatrics emailed Mr. Sharma on Zero based budgeting report that he created and stated "the report obviously took a lot of effort and hard work. I am impressed that you have been able to put together this project with everything else you are doing. Congratulations on putting this together."

59.     On June 24, 2015 Marc Archambeau, Chief Accountant, Ambulatory emailed Mr. Sharma stating that his zero based budgeting work "would set the

benchmark standard across the silos of UI health … as this is "one thought out package."  "It is light years ahead of our current standard."

60.    On June 24, 2015, Dr. Van Voorhees gave Mr. Sharma written compliments on his work performance.  He wrote "Marc many thanks for the careful review and well deserved praise for Suresh" and copied his Associate Head of Finance Dr. Harsha Vardhan Hampasandra Madan Kumar.

61.    July 3, 2015: Dr. Van Voorhees emailed Mr. Sharma in response to the zero based budgeting work and stated "Wonderful.  Excellent work Suresh."

62.    On July 16, 2015, Mr. Sharma received an email from Dr. Van Voorhees relating to Zero based budgeting report stating "Congrats on this GREAT work. I would add the Pediatric summary … and then have her send out celebration."

63.    On July 16, 2015, Mr. Sharma received a text message from Dr. Van Voorhees at 7:42 pm on his cell phone number 630-310-4731 stating "Suresh congrats on your great impromptu presentation to the dean."

### UIC's Office of Access and Equity

64.    On July 6, 2015, Mr. Sharma made a complaint of discrimination and retaliation to UIC's Office of Access and Equity ("OAE").

65.    On July 13, 2015, Mr. Sharma had a meeting with OAE, Marci Fanti and Mr. Nivid Thakar.

66.    During the July 13th meeting Mr. Sharma asked for a congenial, harassment free atmosphere.

67.     During the July 13th meeting Mr. Sharma discussed UIC's funds issue, Dr. Van Voorhees' repeated attempts to get Mr. Sharma to waive or ignore financial controls and procedures, the fact that Dr. Van Voorhees and others were trying to demote Mr. Sharma by shifting major administrative duties to Dr. Harsha Vardhan Hampasandra Madan Kumar, although these were beyond the scope of the visa Dr. Humar obtained, the fact that the consultants and Mr. Van Neck Todd were yelling at Mr. Sharma and the fact that the consultants were harassing Mr. Sharma's staff.

### Medical and Psychological Testing

68.     On July 17, 2015, around noon, Mr. Sharma received a calendar notification from his supervisor and Head of the Department of Pediatrics, Dr. Benjamin Van Voorhees that he needed to meet with Mr. Sharma at 3pm.

69.     Mr. Voorhees did not state the reason for the meeting on July 17, 2015.

70.     Mr. Sharma tried to determine the reason for the meeting by talking with his assistant and Dr. Voorhees' scheduler but nobody knew the reason for the meeting.

71.     Mr. Sharma confirmed he would meet with Dr. Voorhees as soon as his scheduled budget meeting was over around 3pm.

72.     On the afternoon of July 17, 2015, Mr. Sharma was providing a budget presentation to Dr. James Berman, the Division Chief of Gastroenterology, Xochitl Garcia Klapproth, Divisional Administrator, and Dr. Harsha Vardhan Hampasandra Madan Kumar, Associate Head of Finance (who was appointed as associate head of

finance by Dr. Benjamin Van Voorhess in violation of USCIS H1B1 rules at this time despite repeated reminders by Mr. Sharma to both of them).

73.     At about 2:50 p.m. on July 17, 2015, Dr. Van Voorhees and his assistant, Jordan Henry, abruptly interrupted Mr. Sharma in the middle of his presentation to his colleagues, and told Mr. Sharma he needed to come with them immediately.

74.     Dr. Van Voorhees and his assistant were accompanied by two security officers and as soon as Mr. Sharma exited the room, told him he was being taken for a medical evaluation with no explanation for why this was happening.

75.     On the way to University Health Services ("UHS"), Mr. Sharma knocked on HR Coordinator Nivid Thakar's office and asked him if he was entitled to know the reason for the evaluation under UIC's policy.

76.     Before Mr. Thakar could answer, Mr. Van Voorhees interrupted and told Mr. Sharma he should come with them or he would face termination.

77.     Mr. Sharma asked if UIC had a policy on medical evaluations and requested it, but was told by Dr. Van Voorhees that he would be terminated if he did not immediately go to UHS for the medical evaluation.

78.     Mr. Sharma's security keycard and employee badge were demanded and taken away by him in front of Dr. Marder and APN Zahakaylo.

79.     At no time prior to July 17, 2015 did Dr. Van Voorhees or any UIC employee inform Mr. Sharma that there was an issue with his work performance or that any complaint had been made against him.

13

80.     Mr. Sharma's personnel file contains absolutely no mention or reference to any incident or complaint against Mr. Sharma and no disciplinary actions taken against him.

81.     Upon arrival at the UHS clinic on July 17, 2015, Dr. Van Voorhees and Mr. Sharma met Dr. David Marder and APN Trinnette Zahakaylo.

82.     Before leaving UHS, Dr. Van Voorhees rudely demanded Mr. Sharma turn over his UIC badge and keys, which he did.

83.     Mr. Sharma calmly offered Dr. Van Voorhees to give the details of pending office work as well as equipment/data information which Dr. Van Voorhees rudely denied in front of Dr. Marder and APN Zahakaylo.

84.     After Dr. Van Voorhees left, neither Dr. Marder nor Ms. Zahakaylo provided Mr. Sharma with any reason for the evaluation.

85.     During the evaluation, Dr. Marder interrogated Mr. Sharma on numerous topics related to his employment at UIC and recent occurrences in the Department of Pediatrics.

86.     Dr. Marder also required Mr. Sharma to undergo an alcohol and drug test, both of which he passed.

87.     At the end of the evaluation on July 17, 2015, Mr. Sharma was told he was cooperative and no issues were found.

88.     The doctors report showed Mr. Sharma's health to be good and within normal parameters.

89.     Nevertheless, Dr. Van Vorhees required Mr. Sharma to undergo further evaluations with a social worker and a psychological exam with Dr. Alan Friedman.

90.     Prior to July 17, 2015, Mr. Sharma was never warned or told of any complaints about his behavior or work performance.

91.     Mr. Sharma's personnel file has no written warnings and no documentation of any work performance or behavioral problems.

92.     Dr. Marder required Mr. Sharma to authorize the release of any and all of his medical records.

93.     Mr. Sharma was instructed to report back to UHS on July 21, 2015 to undergo a psychiatric evaluation.

94.     Ms. Zahakaylo informed Mr. Sharma that UIC had placed him on administrative leave and that he was not allowed to have any contact with UIC employees or to step foot on the campus.

95.     Mr. Sharma later learned in September 2015, that around the time he was taken for evaluation someone came to the 12th and 13th floors of the building where he works and told everyone to lock their doors due to a safety issue relating to Mr. Sharma

96.     On July 18, 2015, Mr. Sharma met with his own doctor, Dr. Jason Dy who found Mr. Sharma to be in good health and able to return to full duty.

97.     On July 18, 2015, after the visit, Dr. Jason Dy's office faxed UIC a letter stating that Mr. Sharma was medically capable of performing his job duties.

15

98.    Additionally, Mr. Sharma personally handed over a copy of the letter to APN Zahakaylo on July 21, 2015.

99.    On July 20, 2015, an urgent Department meeting was held by Dr. Van Voorhees, Marci Fanti, Daniel Harper and a UIC security officer.

100.    At that meeting, UIC staff were told that Mr. Sharma had been placed on administrative leave and that the staff should keep their doors locked as a safety measure.

101.    At that meeting, handouts were passed out with information for UIC security and the staff were instructed to contact security if they felt threatened.

102.    Later, the locks on the main doors of the Pediatric doors were changed where Mr. Sharma's office was situated.

103.    Mr. Sharma reported to UHS on July 21, 2015.

104.    When he arrived, he was told the psychiatrist was busy and that he was required instead to meet with a social worker, Ms. Geri Biamonte.

105.    Ms. Biamonte asked Mr. Sharma many personal questions about his family and background.  She indicated to Mr. Sharma that he was soft-spoken and cooperative and that he passed the evaluation.

106.    Although Mr. Sharma was previously told that he would have a psychiatric evaluation at UIC, on July 21, 2017, Mr. Sharma was now told that he needed to do a psychological evaluation outside UIC with Dr. Alan Friedman.

107.    Mr. Sharma was told he would be contacted about the appointment.

108.    His administrative leave was continued until July 30, 2015 at 10 a.m. at which time he was to report back to UHS.

16

109.    Mr. Sharma did not hear anything for a week, so on July 29, 2015, he sent an email to Ms. Zahakaylo.

110.    In the email, Mr. Sharma informed Ms. Zahakaylo that Dr. Friedman had not received positive reviews from his patients and he requested the opportunity to pick another physician to do the testing.  He did not get an immediate response until the 08/05/2015 email from Daniel Harper.

111.    During this time threatening messages were left on Mr. Sharma's home phone for him by Dr. Van Voorhees

112.    On July 30, 2015, Mr. Sharma reported to UHC as requested.

113.    After waiting for 30 minutes, Ms. Zahakaylo took him into an exam room and informed him that Dr. Marder was busy.

114.    Mr. Sharma upon demand, signed an authorization to release his records from Dr. Dy to UHS and told Ms. Zahakaylo that UHS could contact Dr. Dy with any questions regarding his health.

115.    Ms. Zahakaylo told Mr. Sharma that he would be contacted to schedule his appointment with Dr. Friedman.

116.    Ms. Zahakaylo extended Mr. Sharma's administrative leave and told him to return to UHS on August 17, 2015 at 10am.

117.    Dr. Van Voorhees instructed Mr. Sharma to see Dr. Friedman on August 10, 2015 at 10 a.m.

118.    Dr. Van Voorhees also instructed Mr. Sharma that he would need to sign a broad medical release and that he was not to have any contact with anyone at UIC except for Ms. Zahakaylo.

17

119.    Mr. Sharma sent an email to Ms. Zahakaylo on August 4, 2015 noting that Dr. Van Voorhees had not responded to his request to see someone other than Dr. Friedman.

120.    After the email to Ms. Zahakaylo, UIC refused to allow Mr. Sharma to see another psychiatrist, refused to provide Mr. Sharma with any information relating to the complaints against him and failed to provide him with the requested medical records.

121.    On August 5, 2015, Mr. Sharma received an email from Mr. Daniel Harper, Associate director of Labor and Employee Relations.

122.    Mr. Harper told Mr. Sharma that he would receive the appropriate information after the evaluations were complete.

123.    Mr. Harper stated that his failure to cooperate would be grounds for discipline, up to and including discharge.

124.    UIC violated its own policy on subjecting employees to medical evaluations.

125.    UIC's written policy required attempts to be made to resolve any problems before resorting to a medical evaluation. This was not done.

126.    UIC's written policy required UIC to inform Mr. Sharma in writing that an evaluation was being required and to provide him with information on his rights and UIC's rights and obligations under its policy.

127.    UIC's written policy required that UIC allow Mr. Sharma to choose a health care professional to perform the medical evaluations from a list prepared by UIC containing the names of 3 to 5 appropriate heath care professionals not

affiliated with UIC – not a friend of the person seeking to terminate him unjustifiably.

### Retaliation against Mr. Sharma's son

128.     UIC next began targeting Mr. Sharma's son, Parth S. Sharma on August 03, 2015 who was a student employee in the department of Pediatrics.

129.     Parth during this time was in the process of studying for and completing his school exams.

130.     On August 6, 2015, Mr. Harper called Mr. Sharma's home and left a threatening voice message for Parth despite the fact that Parth had returned an earlier call from Mr. Harper by leaving him a voice message on August 3, 2016.

131.     In his August 6 voice message, Mr. Harper claimed that he had not heard back from Parth.

132.     Mr. Harper requested Parth to call him to discuss "potential issues which have come up regarding [his] employment at UIC, considering [his] status as a student."

133.     He warned Parth that he needed to be aware that Mr. Harper had "limited flexibility in these matters."

134.     He went on to state: "The State Ethics Act requires that I either receive satisfactory answers to the questions I have, or I have no choice but to report my failure to do so to both University Ethics Office and campus police."

135.     He informed Parth that if his questions were not answered by early next week, he could be expected to be contacted by either one of these organizations.

136.    Neither Mr. Sharma nor Parth had any idea what Mr. Harper was alluding to in his message, as Parth's hiring and payroll was in compliance with UIC policies and he had not been informed of any issues with his employment before UIC initiated the medical evaluation process with Mr. Sharma on July 17.

137.    Parth was not given any work assignment after July 17, 2015.

### Further Reporting and medical testing

138.    On August 07, 2015 Mr. Sharma informed Donna McNeely, University Ethics Officer of the retaliation and reported the unethical and illegal acts of the Dean, Todd Van Neck and Dr. Benjamin Van Voorhees.

139.    On August 10, 2015, Mr. Sharma underwent psychiatric evaluation with Dr. Friedman.

140.    The testing began at 10 a.m. with a series of personal questions.

141.    The testing continued with questions relating to his employment at UIC and within the Department of Pediatrics.

142.    Dr. Friedman returned Mr. Sharma to the waiting area where Mr. Sharma was instructed to answer about 300 true/false questions.

143.    While Mr. Sharma was completing the true/false questions, Dr. Friedman returned and gave him a booklet with 585 more questions.

144.    Shortly before 3pm, Dr. Friedman told Mr. Sharma that he was leaving and that Mr. Sharma should write the completion time on the booklet and lock the door when he left the office.

145.    Mr. Sharma completed the questions at 4:30 p.m.

146.     During the 6.5 hours at Dr. Friedman's office, he did not offer Mr. Sharma a break for food or water.

147.     Mr. Sharma was 50 years of age at this time.

148.     Dr. Friedman contacted Mr. Sharma and stated he needed to see him a second time on August 18, 2015.

149.     During this appointment, Dr. Friedman stated he would be sending his report to Dr. Marder in a few days.

150.     Mr. Sharma reported to UIC on August 20, 2015 as instructed but when he arrived he was told that UHS had not received Dr. Friedman's report yet and he was told his administrative leave would continue.

151.     Mr. Sharma reported to UIC on August 20, 2015 as instructed but when he arrived he was told that UHS had not received Dr. Friedman's report yet and he was told his administrative leave would continue.

152.     Dr. Marder informed Mr. Sharma of the results of the evaluation with Dr. Friedman on August 26, 2015.

153.     Mr. Sharma was told that he was not being released to work because he didn't answer the questions truthfully although he answered all questions truthfully.

154.     Dr. Friedman's report states that Mr. Sharma was sent for evaluation due to alleged troubling comments, inappropriate behaviors, difficulty controlling emotions during group meetings, and angry, disrespectful behavior.

155.    Dr. Friedman stated that he was not able to diagnose the issue since he believed that Mr. Sharma lied on few questions although Friedman had no basis to claim this..

## Alleged Justifications for Medical Testing

156.    On July 31, 2015, after Mr. Sharma made multiple requests for UIC's reason for the medical evaluations, Dr. Van Voorhees sent Mr. Sharma a letter claiming that the reasons for the medical and psychological evaluations were (1) repeated instances of insubordination, (2) disregard of directions; and (3) disorganized thinking.  He also said that after Mr. Sharma was placed on leave, UIC had to "respond to multiple allegations of emotional and physical intimidation, several violations of University Ethics policy involving travel, and potential violations of payroll policies." This was all untrue and none of these baseless accusations were documented in Mr. Sharma's personnel file.

157.    Benjamin Van Vooehees, Dimitri Azar, and Todd Van Neck have continued to materially misrepresent facts in order to justify their actions.

158.    Benjamin Van Voorhees claimed, falsely, in UIC's position statement to the EEOC, that "following the Medical School Graduation in May 2015, Van Voorhees found an administrative employee, Ann Linder, at the front desk of the department crying" and that the employee said that Mr. Sharma had been yelling at her for 3 hours because Dr. Van Voorhees has asked her to move her desk so she could assume some additional responsibility which required privacy.

22

159.    This was patently false because Mr. Sharma was on sick leave the day of the Medical School Graduation, May 08, 2015, when Dr. Van Voorhees allegedly found the administrative employee at the front desk of the department crying.

160.    On May 7, 2015 at 9:56PM, Mr. Sharma sent an email to Dr. Van Voorhees and cc'ing Nivid Thakar and Ann Linder that he will be taking sick leave the following day to care for his son in the hospital.

161.    While Mr. Sharma was at Edwards Hospital the day before on May 7, 2015, a member of the business office staff forwarded Mr. Sharma an email in which the human resources consultant, Juanita LeCrone, asked that Ms. Lindner be moved from the front desk to another room so that she could have some privacy while performing an additional private work assignment.

162.    Mr. Sharma was surprised by this request, as it appeared that Ms. LeCrone was making an independent decision to assign additional responsibilities to his assistant.

163.    Additionally, Mr. Sharma respected Ms. Lindner, and as her direct supervisor, Mr. Sharma wished to protect her and determine whether she could handle this additional work.

164.    Mr. Sharma forwarded the email mentioned in ¶ 174 to Ms. Lindner around noon on May 8, 2015 and asked that she give him a call to discuss the situation.

165.    Mr. Sharma did not hear from Ms. Lindner until 6:47 p.m. on May 8, 2015 when she sent him an email in response.

23

166. In the email, Ms. Lindner apologized for the delay in responding, which she noted spoke "to the point that [she] already has a lot on [her] plate."

167. She further stated that she looked forward to continuing the conversation next week, and thanked Mr. Sharma for his "ongoing support."

168. Van Vorhees, lied to the EEOC in an attempt to cover up his own wrongdoing and justify his tortious and illegal treatment of Mr. Sharma.

169. In its position statement, U of I also claims that Mr. Sharma was threatening to terminate the H1B visas of two employees Dr. Harsha Vardhan Hampasandra Madan Kumar and Piyush Hargunani. This too is patently false.

170. Mr. Sharma was trying to protect these employees as well as the University from noncompliance and financial penalties from United States Citizenship and Immigration Services (USCIS) by bringing to their attention to noncompliance with H1B requirements and suggesting a course of action to remedy this – he did not seek their termination.

171. Both of these employees accepted additional job responsibilities beyond the scope of the H1B visas they had acquired, without going through the H1B amendment process

172. Both Nivid Thakar (Pediatrics HR) and Mr. Sharma explained the visa compliance process to Dr. Van Voorhees, but he did not follow the guidance.

173. On July 08, 2015, Nivid Thakar and Mr. Sharma met with Jim Hammerschmidt to discuss a few employees Visa cases.

174.    In this meeting Jim Hammerschmidt mentioned that no employee on H1B1 should assume additional responsibilities beyond the scope of approved petition.

175.    On July 13, 2015, after Mr. Hargunani would not listen to verbal requests to not get involved with being in charge of building/space remodeling projects assigned to him by Dr. Van Voorhees.

176.    Nivid Thakar sent an email to Piyush Hargunani asking him to discontinue the departmental remodeling assignments not related to approved H1B1 petition until the clarification from OIS was obtained regarding his H1B amendment and copied Mr. Sharma.

177.    On July 15, Piyush Hargunani wrote an email to Benjamin Voorhees's CHECK grant staff that he was stopped by Mr. Sharma for the space projects, copying Dr. Benjamin Van Voorhees.

178.    Instead of recognizing that Mr. Sharma, Thakar and Hammerschmidt all sought to correct the error, Van Vorhees alleged this was an act of insubordination from Mr. Sharma.

179.    As in all other instances, and thoughout his career at U of I, Mr. Sharma wished to protect both the University and employees within his Department from facing the potentially grave consequences that could result from failure to comply with federal visa requirements.

180.    Mr. Sharma knew that Mr. Hargunani and Dr. Kumar were being asked to perform additional responsibilities beyond the scope of their current visas, which had the potential to place their visas at risk and subject the University to claims that

it violated federal law if the employees' visas were not amended before they began performing these additional responsibilities.

181.    Written documentation of Nivid Thakar and Mr. Sharma to Jim Hammerschmidt, Executive Director of the Office of International Office (OIS) supports that Mr. Sharma was trying to protect the University from non-compliance with USCIS H1B rules but this was considered insubordination.

182.    The written documentation proves that Mr. Sharma, in conjunction with Human Resources Officer Nivid Thakar, was working with Jim Hammerschmidt on multiple employees' visa issues in order to ensure that UIC and these employees remained compliant with USCIS rules.

183.    Mr. Sharma learned from Mr. Hammerschmidt that Juanita LeCrone and Marci Fanti from the College of Medicine's Dean's office contacted Mr. Hammerschmidt on July 16, 2015 and asked him if Mr. Sharma had requested that Dr. Kumar's and Mr. Hargunani's visas be terminated.

184.    When Mr. Sharma spoke with Mr. Hammerschmidt on July 16, 2015, Mr. Hammerschrnidt confirmed that he told Ms. Fanti and Ms. LeCrone that this was not the case, and that Mr. Sharma was following up on the amendment of the visas.

### U of I's Final Interactions with Mr. Sharma

185.    On August 28, 2015, Mr. Harper informed Mr. Sharma that he would remain on administrative leave until the department decided how it wished to proceed.

186.    On September 04, 2015, the Ethics Officer responded to Mr. Sharma that she was told by UIC that it was behavior issues that led to his medical evaluation.

187.    On September 25, 2015, Mr. Sharma met with Dr. Van Voorhees and Mr. Harper.

188.    During this meeting Mr. Sharma was presented with a separation agreement with a waiver and release with a threat from Dr. Van Voorhees during the meeting to accept or he would not let him live with dignity.

189.    Mr. Sharma did not sign the above separation agreement.

190.    Mr. Sharma was also told that if he did not resign, UIC would take action against him in October 2015 by truncating his notice rights based on his alleged failure to cooperate with the psychological test, his behaviors in the workplace and alleged insubordination and offers of paid trips in violation of the Ethics Act and violation of the nepotism policy.

191.    On June 28, 2016, Mr. Sharma received an email from Marci Fanti, Director of Human Resources UIC College of Medicine stating that a request was sent to University of Illinois Board of Trustees to issue him a notice of non-reappointment (NOA).

192.    The request was signed by Dr. Benjamin Van Voorhees and Todd Van Neck.

193.    The official Notification of Appointment from Board of Trustees was mailed to his home address. The official NOA lists Mr. Sharma's last day of employment as July 20, 2017.

27

194.     Individuals  of Caucasian descent who engaged in well documented and complained of verbal abuse and intimidation at UIC, were no subjected to any sort of medical evaluations nor were they terminated nor their contracts not renewed.

195.     Dr. Wayne Franklin, a Caucasian male of U.S. origin who held the title Associate Head of Clinical Affairs, had a well-documented and widely known history of verbal abuse and harassment of co-workers and subordinates.

196.     Dr. Franklin was not asked to submit to medical or psychological testing and was given a generous payment upon his separation from UIC.

197.     Krystal Revai, a Caucasian woman, not of Indian origin, also was the subject of repeated complaints about her behavior and verbal abuse and intimidation by her co-workers and subordinates.

198.      Ms. Revai, was not required nor subjected to medical evaluations or psychological evaluations as a condition of continuing her employment.

199.     Todd Van Neck, a Caucasian male of U.S. origin, repeatedly engaged in abusive verbal behavior toward co-workers and subordinates and he has not been disciplined for this behavior.

200.     Mr. Van Neck has not been required to undergo medical or psychological testing as a condition of continuing his employment.

### COUNT I - TITLE VII 42 U.S.C. § 2000e−2
### RACE DISCRIMINATION

201.     Plaintiff re-alleges and incorporates here, by reference, the allegations set forth in paragraphs 1-200.

28

202.    Defendant, through his agents, by taking actions including subjecting Mr. Sharma to unwarranted medical and psychological testing, by lowering the rate of his salary increase after the highest review,  and by ultimately causing Mr. Sharma's termination, has Mr. Sharma's right to be free from discrimination on the basis of race and national origin.

203.    Although several white, male employees of U of I actually were engaged in documented, repeated, abusive behavior toward their subordinates and co-workers, instead of subjecting them to medical and psychological evaluations and terminating them, U of I paid large severance packages to them.

Wherefore, Plaintiff, respectfully requests that the Court enter a judgment against Defendants as follows:

A.  Ordering Defendant U of I to reinstate Mr. Sharma to his position with full salary and benefits;

A.  Awarding any actual monetary losses sustained by the Plaintiff as a direct result of the violations including past and future wages;

B.  The interest on the amount described in the items listed above,

C.  Restoration and make-whole relief for the loss of any employment benefits or other compensation denied or lost by the Plaintiff;

D.  An Order prohibiting the Defendant from any further prohibited discrimination against him;

E.  Compensatory damages against all Defendants for subjecting him to humiliating, unwarranted and tortious medical, psychological and other treatment ;

F.  Punitive damages against individual Defendant in an amount sufficient to discourage Defendant from subjecting others to this conduct;

G.  An award of attorney's fees pursuant to 42. U.S.C. Section 1988;

H.  Costs incurred in filing and prosecuting this action; and

I.   Such additional relief as this Court deems appropriate and just

## COUNT II - TITLE VII 42 U.S.C. § 2000e–2
## NATIONAL ORIGIN DISCRIMINATION

204.   Plaintiff re-alleges and incorporates here, by reference, the allegations set forth in paragraphs 1-203 .

205.   Defendant, through its agents, by taking actions including subjecting Mr. Sharma to unwarranted medical and psychological testing, reducing his raise after the most exceptional review, and by ultimately causing Mr. Sharma's termination, have violated Mr. Sharma's right to be free from discrimination on the basis of national origin.

206.   Although several U.S. born employees of U of I actually were engaged in documented, repeated, abusive behavior toward their subordinates and co-workers, instead of subjecting them to medical and psychological evaluations, denying them a raise, and terminating them, U of I paid large severance packages to them or allowed them to leave without such treatment.

Wherefore, Plaintiff, respectfully requests that the Court enter a judgment against Defendants as follows:

A.   Ordering Defendant U of I to reinstate Mr. Sharma to his position with full salary and benefits;

B.   Awarding any actual monetary losses sustained by the Plaintiff as a direct result of the violations including past and future wages;

C.   The interest on the amount described in the items listed above,

D.   Restoration and make-whole relief for the loss of any employment benefits or other compensation denied or lost by the Plaintiff;

E. An Order prohibiting the Defendant from any further prohibited discrimination against him;

F. Compensatory damages against all Defendants for subjecting him to humiliating, unwarranted and tortious medical, psychological and other treatment ;

G. Punitive damages against individual Defendant in an amount sufficient to discourage Defendant from subjecting others to this conduct;

H. An award of attorney's fees pursuant to 42. U.S.C. Section 1988;

I. Costs incurred in filing and prosecuting this action; and

J. Such additional relief as this Court deems appropriate and just

### COUNT III - ADA – 42 U.S.C. § 12102(1)(C)
### TREATING OR REGARDING AN EMPLOYEE AS DISABLED

207.    Plaintiff re-alleges and incorporates here, by reference, the allegations set forth in paragraphs 1-206 .

208.    Defendant, through its agents, by taking actions including subjecting Mr. Sharma to unwarranted medical and psychological testing, reducing his raise after the most exceptional review, and by ultimately causing Mr. Sharma's termination, have violated Mr. Sharma's right to be free from discrimination on the basis of disability by treating or regarding Mr. Sharma as disabled.

Wherefore, Plaintiff, respectfully requests that the Court enter a judgment against Defendants as follows:

A. Ordering Defendant U of I to reinstate Mr. Sharma to his position with full salary and benefits;

B. Awarding any actual monetary losses sustained by the Plaintiff as a direct result of the violations including past and future wages;

C. The interest on the amount described in the items listed above,

D.  Restoration and make-whole relief for the loss of any employment benefits or other compensation denied or lost by the Plaintiff;

E.  An order prohibiting the Defendant from any further prohibited discrimination against him;

F.  Compensatory damages against all Defendants for subjecting him to humiliating, unwarranted and tortious medical, psychological and other treatment ;

G.  Punitive damages against individual Defendant in an amount sufficient to discourage Defendant from subjecting others to this conduct;

H.  An award of attorney's fees pursuant to 42. U.S.C. Section 1988;

I.  Costs incurred in filing and prosecuting this action; and

J.  Such additional relief as this Court deems appropriate and just

## COUNT IV – ADA -42 U.S.C. § 12112(d)(4)(A)
## ADA - SUBJECTING AN EMPLOYEE TO MEDICAL INQUIRIES OR EXAMINATIONS

209.    Plaintiff re-alleges and incorporates here, by reference, the allegations set forth in paragraphs 1-208 .

210.    Defendant, through its agents, by taking actions including subjecting Mr. Sharma to unwarranted medical and psychological testing, by requiring him to sign documents allowing access to his medical records on penalty of termination for not complying , has violated Mr. Sharma's right to be free from discrimination on the basis of disability.

Wherefore, Plaintiff, respectfully requests that the Court enter a judgment against Defendants as follows:

A.  Ordering Defendant U of I to reinstate Mr. Sharma to his position with full salary and benefits;

B.   Awarding any actual monetary losses sustained by the Plaintiff as a direct result of the violations including past and future wages;

C.   The interest on the amount described in the items listed above,

D.   Restoration and make-whole relief for the loss of any employment benefits or other compensation denied or lost by the Plaintiff;

E.   An order prohibiting the Defendant from any further prohibited discrimination against him;

F.   Compensatory damages against all Defendants for subjecting him to humiliating, unwarranted and tortious medical, psychological and other treatment ;

G.   Punitive damages against individual Defendant in an amount sufficient to discourage Defendant from subjecting others to this conduct;

H.   An award of attorney's fees pursuant to 42. U.S.C. Section 1988;

I.   Costs incurred in filing and prosecuting this action; and

J.   Such additional relief as this Court deems appropriate and just

By:   _/s/ Jorge Sanchez____
One of defendant's attorneys.

Jorge Sanchez
Lopez & Sanchez
77 W. Washington, Suite 1313,
Chicago, IL 60602
attysanchez@gmail.com
(312) 420-6784
ARDC# 6244796

Dated October 12, 2017