IN THE UNITES STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Suresh Sharma, | ) | |
|     Plaintiff, | ) | |
| | ) | Case No. 2017-cv-7378 |
|     v. | ) | |
| | ) | The Honorable Andrea R. Wood |
| Board of Trustees of the University of | ) | |
| Illinois Defendant. Dimitri T. Azar, Dean | ) | Magistrate Hon. Susan E. Cox |
| of the University of Illinois (Chicago | ) | |
| campus, College of Medicine), in his | ) | Jury Demanded |
| official and individual capacity; Todd | ) | |
| Van Neck, Associate Dean of | ) | |
| Administration, University of Illinois, | ) | |
| (Chicago Campus, College of Medicine), | ) | |
| in his official and individual capacity; | ) | |
| Benjamin Van Voorhees, Head of | ) | |
| Department of Pediatrics, University of | ) | |
| Illinois, (Chicago campus, College of | ) | |
| Medicine), in his official and individual | ) | |
| capacity, and Dr. Alan Friedman in his | ) | |
| individual capacity | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
FRIEDMAN'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

    Suresh Sharma, (Plaintiff) by and through his attorney, Jorge Sanchez, presents his Plaintiff's Memorandum Of Law In Opposition To Defendant Friedman's Motion To Dismiss His Second Amended Complaint as follows:

**INTRODUCTION**

    After years of progressively moving up and laterally as an employee of University of Illinois Chicago (UIC), Mr. Sharma worked as Director of Administrative Operations for the Department of Pediatrics at UIC. (Docket 19 ¶¶7, 16-24) Mr. Sharma excelled in each of these positions and routinely received high-scoring evaluations. (Docket 19 ¶¶25-26) Mr. Sharma took seriously the policies, protocols and procedures as an individual charged with, among other things, overseeing the finances of the Department

of Pediatrics. Mr. Sharma's colleague, Marc Archambeau, Director of Finance and Chief Accountant, Ambulatory, told Sharma that Sharma's insistence on adherence to and enforcement of UIC policies caused consternation with Defendants Todd Van Neck and Dimitri Azar and that he understood that they wanted to terminate him because of this. (Docket 19 ¶¶26-27) Mr. Sharma raised numerous other issues regarding proper protocol and procedures, despite this there were no overt actions taken by UIC Defendants against Mr. Sharma (except for the cutting his raise). until he was abruptly ordered out of a work meeting by Defendant Van Vorhees. Van Vorhees ordered Mr. Sharma to undergo a medical evaluation, sign a release for his medical records, and be evaluated by UIC's health services. (Docket 19 ¶¶83-101) Despite being cleared by Marder, Defendant Van Vorhees required Mr. Sharma to subject himself to a further evaluation by Dr. Alan Friedman. Mr. Sharma alleged that Van Vorhees and Friedman were friends and conspired to have Friedman provide a rationale – after the fact -- to remove and/or keep Mr. Sharma from returning to work. (Docket 19 ¶¶133-136) Friedman provided such a pretext by accusing Mr. Sharma of lying during his examination, though Friedman had never met Mr. Sharma before nor did he have any basis for claiming such. (Docket 19 ¶¶161-163)

  Mr. Sharma brought counts one through five of his Second Amended Complaint against Defendant UIC only. Mr. Sharma is abandoning his First Amendment count (six), on the basis that his speech acts were done in performance of his job duties. He is also abandoning his Defamation count (eleven) due to the statute of limitations. His counts under Section 1981 (nine), and for retaliatory discharge (twelve), also lie only against Defendant UIC.

For the reasons argued more fully below, Mr. Sharma opposes dismissing Defendant Friedman in his personal capacity (he has no official capacity that Plaintiff is aware of), for violation of his right to equal protection (count seven), due process (count eight), interference with contract/prospective economic advantage (count ten), and intentional infliction of emotional distress (count thirteen).

To the extent that Defendant Freidman references arguments made by UIC Defendants against these counts, Plaintiff Sharma adopts his responses to these in response to Friedman's references. As to the constitutional claims brought, Mr. Sharma has alleged that UIC individual Defendants (acting under color of law) conspired and/or acted in concert with Friedman to deprive Mr. Sharma of his constitutional rights to equal protection and due process. There is no individual immunity as to Plaintiff's two common law counts to provide cause for Defendant Friedman's dismissal from these.

**ARGUMENT**

I. **Defendant Friedman acting in concert with and/or conspiring with UIC individual Defendants can be held liable in his personal capacity, despite not being a State actor himself.**

Defendant Friedman asserts that "counts VI – IX do not name Dr. Friedman in any way in an individual capacity." (Docket 33 p. 3) In fact, Mr. Sharma's Second Amended Complaint at paragraph 242 states: "Plaintiff brings this count [seven – equal protection] against all Defendants and against all individual Defendants in their official and *individual* capacities." (Docket 19 ¶242 (emphasis supplied)) Mr. Sharma makes the same averment with respect to his due process count VIII. (Docket 19 ¶247)

Mr. Sharma alleged in count seven that Defendants (this would include Friedman) subjected him to "unwarranted medical and psychological testing and by ultimately

3

causing Mr Sharma's termination, have violated and also conspired to violate Mr. Sharma's right to be free from discrimination on the basis of race and national origin." (Docket 19 ¶243) Mr. Sharma makes the same averment with respect to his count eight except that he alleged a violation of his "right to be free from the arbitrary taking of his property without due process of law." (Docket 19 ¶248)

Courts have routinely held private parties – that is, non-state actors -- liable for constitutional violations when they have acted in concert with state actors (acting under color or authority of law), to deprive people of their Constitutional rights. The Supreme Court held in *United States v. Price*, 383 U.S. 787, 794 (1966):

> Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.

In *Hanania v. Loren–Maltese*, 212 F.3d 353, 356 (7th Cir.2000) the Seventh Circuit explained that

> A private actor, such as Zansitis, can have acted under color of law if the plaintiff can establish that "(1) the private individual and a state official reached an understanding to deprive the plaintiff of her constitutional rights and (2) the private individual was a willful participant in joint activity with the state or its agents.

Plaintiff believes that he has adequately pleaded these two allegations that Friedman conspired with UIC defendants, who, in their official capacity, acted under color of law to subject Mr. Sharma to unwarranted medical and psychological examinations to create a pretext and cover for removing him from his job. (Docket 19 ¶¶ 243,248) Mr. Sharma objected to being evaluated by Defendant Friedman, a "friend of the person who was trying to fire him." (Docket 19 ¶136) After numerous violations of UIC owns policies, UIC defendants forced Mr. Sharma to be evaluated by Friedman

despite Sharma's objections. (Docket 19 ¶¶133-136) Ultimately Sharma "was told that he was not being released to work because he didn't answer the questions truthfully although he answered all questions truthfully." (Docket 19 ¶161)

Mr. Sharma also alleged that, "Dr. Friedman stated that he was not able to diagnose the issue since he believed that Mr. Sharma lied on few questions although Friedman had no basis to claim this." (Docket 19 ¶163) UIC Defendants used Friedman's report based on nothing more than bare allegations that Mr. Sharma was being untruthful, first to attempt to pressure him to quit (Docket 19 ¶195), and then causing him to be terminated. (Docket 19 ¶¶199-200) Mr. Sharma then points to white UIC employees who had well documented instances of repeated verbally, publicly abusive behavior and who were not subject to any such examinations, nor terminations. (Docket 19 ¶¶202-207) This too is sufficient to allege a violation of Mr. Sharma's Equal Protection rights as similarly situated white individuals were treated differently from Mr. Sharma who is of Indian descent and has dark skin.

As to his Due Process count, Mr. Sharma alleged that on his way to being evaluated after being abruptly pulled from a meeting, he "knocked on HR Coordinator Nivid Thakar's office and asked him if he was entitled to know the reason for the evaluation under UIC's policy," but that Van Vorhees interrupted and told Mr. Sharma that he must accompany him or be fired. (Docket 19 ¶¶86-7) Mr. Sharma requested the UIC policy on medical evaluations but Van Vorhees told him, again, that he must go to University Health Services (UHS) or face termination. Despite being cleared by University Health Services, Van Vorhees required further evaluations. (Docket 19 ¶¶95-

99) After showing up for the exam at UHS, Mr. Sharma was told that the psychiatrist was busy and that he was required instead to meet with a social worker. (Docket 19 ¶113)

Although Mr. Sharma passed this evaluation, Van Vorhees then required yet another evaluation – this time with Friedman who would contact Mr. Sharma. (Docket 19 ¶¶115-116) Mr. Sharma requested to have a different evaluator Mr. Sharma alleges repeated deferrals of his examination and repeated refusals to provide him with information about UIC policies related to medical examinations and his right to request a different evaluator. (Docket 19 ¶¶114- 132) Mr. Sharma also alleged numerous violations of UIC's own policies in their treatment of him including: not making any attempt to resolve any problems before resorting to a medical evaluation; not informing him in writing that they required an evaluation of him; nor informing him of his rights and UIC's obligations. (Docket 19 ¶¶133-135) Perhaps the most telling omission was UIC's failure to inform Mr. Sharma of his right to select an evaluator "from a list of 3-5 appropriate health care professionals not affiliated with UIC – not a friend of the person seeking to terminate him unjustifiably." (Docket 19 ¶¶136)

Mr. Sharma believes that, as with his Equal Protection count, he has adequately pleaded facts to put all Defendants on notice, including Friedman, of the facts that form the basis of the claims against them. To the extent the Court decides otherwise, Plaintiff respectfully requests leave to clarify these details further, if necessary.

## II. Defendant Friedman knew of Mr. Sharma's economic expectancy and/or contract and interfered with it, causing Mr. Sharma to lose his job or reappointment.

Defendant Friedman states that Plaintiff failed to allege that Defendant Friedman "intentionally took steps to interfere with Plaintiff's employment relationship with UIC."

6

(Docket 33 p. 6) Based on the recitation of facts in Section I above, it seems clear enough that Freidman knew Mr. Sharma was employed by UIC and that Mr. Sharma's ability to return to work was contingent on Friedman clearing him for work. Plaintiff alleged not just negligence, or an inability to reach a diagnosis as Friedman claims (Docket 33 p. 6), but a conspiracy to build a pretextual case for terminating him. Hear Mr. Sharma also alleges that Friedman's conclusion was foregone in that Van Vorhees steered him to a friend, who then had only to accuse Mr. Sharma of dishonesty to deny him clearance to return to work. This *is* intentional conduct.

Defendant makes much of the fact that Mr. Sharma did not allege medical malpractice. But, the Plaintiff is the master of his Complaint and cannot be forced to bring one claim over another. The evaluation and Dr. Friedman's participation in the scheme are certainly unjustified despite his contentions otherwise. If proven, these facts (which must be taken as true for purposes of this motion), are for more than what is required to prove interference with contract/prospective economic advantage.

### III. To the extent that Defendant Friedman knew of and was an active participant in the scheme to terminate Mr. Sharma he too is liable for intentional infliction of emotional distress.

Mr. Sharma adopts his arguments above and those in response to UIC Defendants' Motion to Dismiss. Furthermore, if Dr. Friedman provided a sham evaluation as a pretext to force Mr. Sharma to resign, and failing that, to be terminated, it seems clear enough that making the baseless accusation of dishonesty as part of a scheme to fire Mr. Sharma rises to the level of intentional infliction of emotional distress. This abusive gaslighting in which a medical professional compromises his professional ethics is beyond the pale and, if proven, would create certain liability for Friedman.

7

## **CONCLUSION**

For all the foregoing reasons as detailed above, Plaintiff respectfully requests that the Court deny Defendant Friedman's Motion to Dismiss as argued above, to the extent the Court believes that Plaintiff's Complaint falls short of adequately pleading any count the dismissal of which Plaintiff has contested, Plaintiff requests leave to amend the Complaint to cure any such deficiencies.

                                       Respectfully submitted,

                           By:   /s/ Jorge Sanchez
                              One of Plaintiff's attorneys.

Jorge Sanchez
Lopez & Sanchez
77 W. Washington, Suite 1313,
Chicago, IL 60602
attysanchez@gmail.com
(312) 420-6784
ARDC# 6244796

Dated: April 3, 2018