# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SURESH SHARMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17-cv-07378 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Suresh Sharma, a former employee of the University of Illinois College of Medicine ("UIC Med"), alleges that Defendants Board of Trustees of the University of Illinois ("Board"), Dimitri T. Azar, Todd Van Neck, Benjamin Van Voorhees, and Alan Friedman targeted Sharma and ultimately terminated his employment due to his race and because he reported their misconduct. Sharma has filed a Second Amended Complaint ("SAC") asserting claims based on Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the State Officials and Employees Ethics Act ("Ethics Act"), 5 ILCS 430/1 *et seq.*, and the Fifth and Fourteenth Amendments to the United States Constitution. He also asserts several state common law tort claims, including claims for interference with contract or prospective economic advantage, retaliatory discharge, and intentional infliction of emotional distress.[1] Before the Court are two motions to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6): one motion

---

[1] The SAC also includes a First Amendment retaliation claim (Count VI) and a common law defamation *per se* claim (Count XI), both of which Sharma concedes should be dismissed. (*See* Pl.'s Opp. to UIC Defs.' Mot. to Dismiss at 10, 15, Dkt. No. 37-1.) The Court thus dismisses those claims without prejudice.

filed on behalf of the Board, Azar, Van Neck, and Van Voorhees (collectively, "UIC Defendants") and a separate motion on behalf of Friedman. (Dkt. Nos. 23, 32.) For the reasons explained below, the UIC Defendants' motion is granted in part and denied in part, and Friedman's motion is granted in its entirety.

## BACKGROUND

For the purposes of Defendants' motions to dismiss, this Court accepts as true the well-pleaded facts in the SAC and views those facts in the light most favorable to Sharma. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826–27 (7th Cir. 2015). Sharma has alleged as follows.

### ***The Parties***

Sharma, who identifies his race as Asian and his national origin as Indian, used to work at the University of Illinois at Chicago ("UIC"). (SAC ¶ 7, Dkt. No. 19.) Sharma was initially hired in July 2005 by the UIC Office of the Dean, College of Urban Planning and Public Affairs, as a Business and Financial Systems Specialist. (*Id.*) Eventually, after multiple promotions, Sharma became Director of Administrative Operations for the Department of Pediatrics ("Department") at UIC Med. (*Id.*) Despite receiving praise from multiple individuals within the Department and achieving high scores on his annual performance reviews, Sharma was terminated on June 28, 2016, with his discharge becoming effective on July 20, 2017. (*Id.* ¶¶ 7, 20–22, 25.)

The Board oversees the University of Illinois's various campuses, including UIC. (*Id.* ¶ 8.) During the relevant time period at UIC, Azar held the title of Dean, Van Neck was Associate Dean of Administration, and Van Voorhees was the Head of the Department and, at times, Sharma's immediate supervisor. (*Id.* ¶¶ 9–11, 78.) Friedman, who works as a psychiatrist at Northwestern University, has been named as a defendant in this case based on a psychiatric evaluation of Sharma he conducted at UIC's request. (*Id.* ¶ 14.)

### *The Bad-Debt Issue*

In 2011, the Board appointed Azar as Interim Dean of UIC Med. (*Id.* ¶ 27 at 6.)[2] In 2013, after Azar officially took over as Dean, Sharma reported a concern regarding UIC's financial statements: the line item for bad-debt expenses increased in the 2012 fiscal year (Azar's first year as Dean) by approximately $1 million compared to earlier years. (*Id.* ¶¶ 28, 21 at 6.) (For purposes of this opinion, the Court will refer to this accounting matter as the "bad-debt issue.") After investigating, Sharma determined that UIC had begun to record bad-debt expenses for the Department at very high dollar amounts, resulting in erroneous year-end operating statements. (*Id.* ¶ 22.) Sharma reported the bad-debt issue to Dr. Usha Raj, who at the time was the Head of the Department and Sharma's immediate supervisor. (*Id.* ¶ 23.)

Others at UIC soon found out about Sharma's discovery, including Van Neck, who was Associate Dean for Administration and Finance. (*Id.* ¶ 24.) Sharma's co-worker, Marc Archambeau, told Sharma that Van Neck and others in the Dean's office were "unhappy" with Sharma for bringing the bad-debt issue to light because it reflected poorly on them. (*Id.* ¶ 26.) Archambeau warned Sharma to be careful, saying that Azar and Van Neck had bad-mouthed Sharma and intended to terminate him. (*Id.* ¶ 27.)

Rather than stay quiet, Sharma voiced his concerns about being targeted by Azar and Van Neck to Raj, who reassured him that he was doing a good job and she had no issues with his work performance. (*Id.* ¶¶ 28–29.) At Sharma's next performance review, Raj awarded Sharma 35 out of 36 points and approved a seven percent merit raise for him. (*Id.* ¶ 30.) Yet Sharma ultimately received only a three percent merit raise. (*Id.* ¶ 31.) Raj explained to Sharma that Van Neck and

---

[2] The SAC contains a typographical error in the numbering of the paragraphs on page 6, whereby paragraph 28 is followed by a second series of paragraphs numbered 21–28.

Marci Fanti, Director of Human Resources at UIC Med, lowered Sharma's raise as punishment for raising the bad-debt issue. (*Id.* ¶ 32.)

Subsequently, in January 2015, UIC determined that the codes used to classify bad debts versus insurance adjustments were outdated and instituted a system-wide reform, confirming Sharma's suspicions about the bad-debt issue. (*Id.* ¶¶ 34–36.) Around that time, Archambeau again warned Sharma that certain individuals at UIC felt he was a troublemaker and wanted him to be terminated. (*Id.* ¶ 37.)

### ***Conflicts with Van Voorhees***

Also in January 2015, Sharma refused to approve certain travel expenses submitted by Van Voorhees that violated UIC policies and procedures. (*Id.* ¶¶ 39–42.) In February, Azar removed Raj from her position as Department Head and replaced her with Van Voorhees. (*Id.* ¶¶ 44–45.) Then, on March 4, 2015, Sharma again refused to authorize improper payroll payment requests for payments to Van Voorhees's "life empathy coach," as doing so would be illegal and violate UIC policies and procedures. (*Id.* ¶¶ 48–50.) Van Voorhees repeatedly pressured Sharma to transfer funds retroactively to his grant during the eight months prior to his promotion to Department Head, but Sharma refused. (*Id.* ¶ 51.)

In March and April 2015, Sharma applied and interviewed for the position of Associate Dean for Administration and Finance at UIC's College of Dentistry, but he was not selected. (*Id.* ¶ 47.) Sharma believes Defendants intervened and sabotaged his candidacy, but he does not specifically identify which Defendants did so or describe any specific conduct. (*Id.*)

On April 22, 2015, Sharma was in a budget meeting when Van Voorhees forcefully dragged Sharma to his office. (*Id.* ¶ 52.) There, Van Voorhees and Dr. Mary Lou Schmidt pressured Sharma to violate UIC's internal pay equity process and policy by immediately

processing a $10,000 salary increase for an employee named Laura Ravens. (*Id.* ¶¶ 53–54.) For the next three months, Van Voorhees continued pressuring Sharma to administer the salary increase for Ravens. (*Id.* ¶ 54.) Sharma ultimately agreed to do so but informed Van Voorhees and Schmidt that he wished to follow the internal pay equity process and policy with respect to other employees to prevent potential lawsuits. (*Id.* ¶ 55.)

Between March 2015 and May 2015, Van Voorhees hired two Caucasian consultants to work in the Department, who yelled at Sharma on multiple occasions. (*Id.* ¶¶ 58–60.) Sharma complained to Van Voorhees about the situation, but neither Van Voorhees nor any other Defendant did anything to intervene. (*Id.* ¶¶ 63–64.) Sharma also complained about his treatment to UIC's Office of Access and Equity ("OAE") and asked for a "congenial, harassment free atmosphere." (*Id.* ¶¶ 65, 74–76.) In his meeting with the OAE, Sharma recounted the bad-debt issue, the repeated attempts by Van Voorhees to get Sharma to waive or ignore financial controls and procedures, attempts by Van Voorhees to demote Sharma, and incidents when Van Voorhees and the consultants yelled at Sharma. (*Id.* ¶ 77.) But the OAE ultimately decided that Defendants had not retaliated against him. (*Id.* ¶ 66.)

Meanwhile, Sharma continued to perform his job responsibilities at a high level, receiving compliments on his work from supervisors and colleagues. (*Id.* ¶¶ 67–73.) At no point did Van Voorhees or any other UIC employee inform Sharma about any issues with his work performance or that any complaints had been lodged against him. (*Id.* ¶ 88.)

### *The Evaluations*

On July 17, 2015, around noon, Sharma received a vague calendar notification from Van Voorhees for a meeting at 3:00 p.m. (*Id.* ¶ 78.) That afternoon, Sharma was giving a budget presentation when Van Voorhees, accompanied by his assistant and two security officers, abruptly

interrupted and instructed Sharma to follow him. (*Id.* ¶¶ 82–84.) When Sharma followed him out of the room, Van Voorhees said that Sharma was being taken for a medical evaluation at University Health Services ("UHS"). (*Id.* ¶¶ 84–85.) On his way to UHS, Sharma knocked on the door to Human Resources Coordinator Nivid Thakar's office and asked if under UIC's policies he was entitled to know the reason for the evaluation. (*Id.* ¶ 85.) Before Thakar could answer, Van Voorhees interrupted and told Sharma that he would be fired if he did not immediately comply. (*Id.* ¶¶ 86–87.) Sharma then asked whether UIC had a policy on medical evaluations and requested a copy of any such policy, but Van Voorhees again threatened to fire Sharma. (*Id.* ¶ 87.) Sharma later learned that after he left the building to go to UHS, Defendants arranged for someone to inform the employees in the building to lock their doors due to a safety issue involving Sharma. (*Id.* ¶ 104.)

When they arrived at the UHS clinic, Sharma and Van Voorhees met with two other UIC employees, Dr. David Marder and Trinnette Zahakaylo. (*Id.* ¶ 91.) Van Voorhees demanded that Sharma turn over his UIC badge and keys and then left. (*Id.* ¶ 92.) Marder interrogated Sharma about his employment at UIC and recent occurrences within the Department. (*Id.* ¶ 95.) Marder also instructed Sharma to take alcohol and drug tests, which he passed. (*Id.* ¶ 96.) Finally, Marder required Sharma to authorize the release of his medical records. (*Id.* ¶ 101.) At the end of the evaluation, Sharma was told that he had been cooperative and no issues had been identified. (*Id.* ¶ 97.) Nonetheless, Zahakaylo informed Sharma that UIC had placed him on administrative leave and that he was not permitted to have any contact with UIC employees or set foot on campus. (*Id.* ¶ 103.)

Three days later, on July 20, 2015, Van Voorhees, Fanti, Daniel Harper (Associate Director of Labor and Employee Relations), and a UIC security officer held an urgent Department

meeting, at which they told other UIC employees that Sharma had been placed on administrative leave and that they should keep their doors locked as a safety measure and contact security if they felt threatened. (*Id.* ¶¶ 108–10.)

On July 18, Sharma met with his personal doctor, Dr. Jason Dy, who found him to be in good health and able to return to full duty. (*Id.* ¶ 105.) After the visit, Dy's office faxed a letter to UIC stating that Sharma was medically capable of performing his job duties. (*Id.* ¶ 106.) Sharma also personally handed a copy of Dy's letter to Zahakaylo on July 21, 2015. (*Id.* ¶ 107.) Nonetheless, Van Voorhees required Sharma to undergo further evaluations with a social worker and a psychiatrist. (*Id.* ¶ 99.) On July 21, Sharma reported to UHS as instructed, where he met with a social worker. (*Id.* ¶¶ 112–13.) The social worker asked Sharma personal questions about his family and background. (*Id.* ¶ 114.) Afterwards, she told Sharma that she perceived him as soft-spoken and cooperative and that he had passed her evaluation. (*Id.*)

Sharma was also told that, despite earlier representations that he would undergo the psychiatric evaluation at UIC, he would have to meet with Friedman, a psychiatrist from Northwestern University. (*Id.* ¶ 115.) Sharma subsequently contacted Zahakaylo via email, expressing concerns that Friedman had not received positive reviews from his patients and requesting another physician, but his request was denied. (*Id.* ¶ 119.)

On July 31, 2015, Van Voorhees sent Sharma a letter claiming that the reasons for the evaluations were: (1) repeated instances of insubordination, (2) disregard of directions, and (3) disorganized thinking. (*Id.* ¶ 164.) Van Voorhees also falsely stated that after Sharma was placed on leave, UIC had to respond to multiple allegations of emotional and physical intimidation, several violations of UIC's ethics policy involving travel, and potential violations of UIC's payroll policies. (*Id.*) However, Sharma's personnel file did not reflect any of these issues.

(*Id.*) Furthermore, Caucasian employees who actually engaged in well-documented verbal abuse and intimidation at UIC had not been subjected to any of the same treatment as Sharma, such as medical evaluations or administrative leave. (*Id.* ¶¶ 201–07.)

On August 5, 2015, Sharma received an email from Harper stating that he would receive information about the complaints against him after completing the evaluations. (*Id.* ¶ 131.) Harper also stated that Sharma would be disciplined and potentially fired if he failed to cooperate. (*Id.* ¶ 132.) In addition, Harper called Sharma's home on August 6 and left a threatening voicemail message for Sharma's son Parth, a student employee at the Department. (*Id.* ¶¶ 139–45.) Van Voorhees similarly left threatening voicemail messages on Sharma's home phone. (*Id.* ¶ 120.) On August 7, Sharma informed Donna McNeely, University Ethics Officer, of the unethical, illegal, and retaliatory acts of Azar, Van Neck, and Van Voorhees. (*Id.* ¶ 147.)

Van Voorhees eventually instructed Sharma to see Friedman on August 10. (*Id.* ¶ 126.) When Sharma arrived that day, Friedman asked him a series of personal questions, followed by questions relating to his employment at UIC and within the Department. (*Id.* ¶¶ 149–50.) Friedman then instructed Sharma to answer two questionnaires with almost 900 questions, which took Sharma several hours. (*Id.* ¶¶ 151–52, 155.) Ultimately, Friedman submitted a report to Marder stating that Sharma had been forced to undergo a psychiatric evaluation because of his troubling comments, difficulty controlling his emotions during group meetings, inappropriate behavior, and angry and disrespectful behavior. (*Id.* ¶ 162.) Friedman concluded that he could not diagnose the issue because he believed Sharma had lied in response to some of his questions. (*Id.* ¶ 163.)

On September 25, 2015, Sharma met with Van Voorhees and Harper, who presented him with a separation agreement with a waiver and release. (*Id.* ¶¶ 194–95.) Van Voorhees threatened Sharma that if he did not sign the release, Van Voorhees "would not let him live with dignity," and UIC would truncate his notice rights.[3] (*Id.* ¶¶ 195, 197.) Nonetheless, Sharma did not sign the agreement. (*Id.* ¶ 196.) On June 28, 2016, Sharma received an email from Fanti stating that Van Voorhees and Van Neck had signed a request to the Board requesting a notice of non-reappointment ("NOA") as to Sharma. (*Id.* ¶¶ 198–99.)

On January 7, 2016, Sharma filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of color, national origin, age, and disability, and alleging that he had been subjected to retaliation and improper medical evaluations. (*Id.* ¶ 208.) In UIC's position statement to the EEOC, Van Voorhees made multiple false statements about Sharma, accusing him of misconduct and unprofessional behavior. (*Id.* ¶¶ 166–91.) On July 17, 2017, the EEOC issued Sharma a notice of right to sue. (*Id.* ¶ 209.)

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual allegations, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[3] The SAC is unclear regarding the implications of this threat. But the allegation suggests that Van Voorhees intended to intimidate Sharma into signing the waiver and release.

liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

## I.      Title VII Race Discrimination (Count I)

The UIC Defendants first ask the Court to dismiss Count I, contending that Sharma failed to exhaust his administrative remedies before filing suit by failing to include race-based discrimination in his EEOC charge.[4]

"Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC." *Moore v. Vital Prods, Inc.*, 641 F.3d 253, 256 (7th Cir. 2011). The purpose of this rule is to afford the EEOC and the employer an opportunity to settle the dispute, as well as to give the employer some warning of the conduct about which the employee is aggrieved. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). Moreover, recognizing that most EEOC charges are completed by lay persons, a Title VII plaintiff need not allege in an EEOC charge each and every fact that forms the basis of each claim in the complaint. *Id.* Instead, a plaintiff may bring Title VII claims if there is a reasonable relationship between the allegations in the EEOC charge and the claims in the complaint, and the claims in the complaint could reasonably have been expected to grow out of an EEOC investigation of the allegations in the EEOC charge. *Id.* Put simply, even if a plaintiff does not include certain claims in his EEOC charge, he may still include them in his complaint if they are "like or reasonably related to the allegations of the EEOC charge and growing out of such allegations." *Moore*, 641 F.3d at 256 (internal quotation marks omitted). And to be "like or reasonably related," the

---

[4] The Court observes that in Friedman's motion to dismiss, he advances arguments for dismissal of Counts I–V against him. (Dkt. No. 32.) However, Sharma only asserts those Counts against the Board. Therefore, the Court disregards as moot Friedman's arguments for dismissal of Counts I–V.

relevant claim and EEOC charge "must, at a minimum, describe the same conduct and implicate the same individuals." *Id.* (internal quotations omitted).

Here, Sharma's race-based discrimination claim is like or reasonably related to the color-based discrimination claim in his EEOC charge. Sharma's EEOC charge contains nearly identical factual allegations and parties as the SAC; for example, both documents allege that Sharma was employed by UIC and his work performance met or exceeded UIC's expectations, but UIC nonetheless required him to undergo multiple evaluations, threatened to terminate him, and placed him on administrative leave.[5] (Pl.'s EEOC Charge of Discrimination at 2–4, Dkt. No. 39.) Sharma's EEOC charge also describes UIC's discriminatory treatment of people of color— describing himself as a person with "brown" skin color—and UIC's comparably favorable treatment towards "[o]ther similarly situated employees who do not have brown skin color" and "Caucasians." (*Id.* at 5.) Thus, the Court finds that the race-based claim in the SAC and the color-based claim alleged in the EEOC charge are reasonably related, and further, that the former claim would be expected to grow out of an investigation of the latter. Therefore, the Court denies the UIC Defendants' motion to dismiss Count I.[6]

## II.     ADA Claims (Counts III and IV)[7]

Turning to Sharma's ADA claims, Count III alleges a violation of § 12102(1)(C), which imposes liability for conduct that violates the ADA even if directed toward a person who is not actually disabled, so long as that person was regarded as disabled. 42 U.S.C. § 12102(1)(C);

---

[5] While Sharma's EEOC charge does not state that he was ultimately terminated, the charge was filed in January 2016, *i.e.*, before Sharma received his NOA in June 2016.

[6] The UIC Defendants also contend that Sharma voluntarily withdrew his race discrimination claim at a court hearing on their motion to dismiss. But Sharma merely indicated at the motion hearing that he **might** withdraw this claim; his subsequent filing made clear that he was not actually doing so. (*See* Pl.'s Opp. to UIC Defs.' Mot. to Dismiss at 3–4.)

[7] Defendants have not moved to dismiss Count II. Therefore, Count II will proceed against the Board.

*Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 195 (7th Cir. 2011). Count IV alleges a violation of § 12112(d)(4)(A), which prohibits a covered entity from requiring an employee to undergo a medical examination unless it is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

As an initial matter, the UIC Defendants argue that Counts III and IV are duplicative, and thus the Court should strike one of them. Indeed, where "there is really no qualitative difference" between two counts and one "adds nothing to [the other's] claim for relief," the Court may strike a count as duplicative. *Krawczyk v. Re*, 37 F. Supp. 2d 1106, 1108–09 (N.D. Ill. 1999). That is not the case here, however, as Counts III and IV require different elements. For example, Sharma could state a claim under Count III adequately without any reference to a medical examination, which is an essential element of Count IV. In fact, as alleged, Sharma includes other conduct by UIC in Count III, including "reducing his raise after the most exceptional review, and . . . ultimately causing Mr. Sharma's termination." (SAC ¶ 217.) In addition, § 12112(d)(4)(A) protects all employees, regardless of whether they have a qualifying disability under the ADA or are perceived as disabled by their employers. *See Wright v. Ill. Dep't of Children and Family Servs.*, 798 F.3d 513, 522 (7th Cir. 2015). Thus, to prevail under Count IV, Sharma need not show that he had an actual or perceived disability, which is a required element under Count III. Because the Counts III and IV require different elements to state valid claims, they are not duplicative, and the Court therefore denies Defendants' motion to strike one of the counts.

## A. Disability Discrimination (Count III)

The Court next examines whether Sharma has adequately stated a discrimination claim under the ADA in Count III. The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the discharge of employees . . . and

other terms, conditions, and privileges of employment." 42 U.S.C. §12122(A); *Steffen v. Donahoe*, 680 F.3d 738, 743 (7th Cir. 2012). Here, Sharma has alleged that UIC discriminated against him by subjecting him to examinations, placing him on administrative leave, and ultimately terminating him. Sharma does not allege that he actually suffers from a disability; instead, he claims that UIC regarded him as disabled. To state a valid claim under the "regarded as" prong of the ADA, Sharma must allege facts indicating that UIC "believed, rightly or wrongly, that he had an impairment that substantially limited one or more major life activities." *Miller*, 643 F.3d at 195.

In the SAC, Sharma has alleged facts showing that UIC believed he had "disorganized thinking," had "difficulty controlling emotions during group meetings," engaged in "inappropriate behaviors," and could be dangerous or prone to violence. (*See* SAC ¶¶ 109–11, 162.) These could very well be symptoms of a mental impairment.[8] Sharma also claims that UIC forced him to undergo a psychiatric evaluation, further suggesting UIC believed he had a mental impairment. (*See id.* ¶ 99.) In addition, Sharma alleges that UIC placed him on administrative leave, forbade him from having any contact with other UIC employees or setting foot on campus, and ultimately terminated him. (*Id.* ¶¶ 103, 162, 217.) In short, Sharma has pleaded that UIC regarded him as substantially limited in his ability to work, which qualifies as a major life activity under the ADA. *See Miller*, 643 F.3d at 195. Sharma thus has alleged adequately that UIC discriminated against him because it regarded him as disabled, and therefore Count III survives Defendants' motion to dismiss.

---

[8] The UIC Defendants may be able to argue at the summary judgment stage that they regarded Sharma's behavior as merely unprofessional or problematic, rather than symptoms of a mental impairment. However, those are questions of fact, which the Court will not decide on a motion to dismiss.

### B. Unwarranted Medical Examination (Count IV)

As noted above, the ADA also prohibits employers from requiring employees to undergo medical examinations unless they are "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). In this case, Sharma has alleged in Count IV that UIC forced him to undergo an unwarranted medical examination, despite his exemplary work performance and consistent professionalism.

While Defendants may dispute this allegation and contend that Sharma's evaluations were job-related and consistent with business necessity, such arguments are inappropriate at the pleading stage. *See Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1060 (7th Cir. 1998) (affirming denial of motion to dismiss that argued employee's psychological evaluation was job-related and consistent with business necessity because "[a]t a later stage in this litigation, [Defendant] will have an opportunity to demonstrate that it was necessary to make such an inquiry in this situation"); *e.g.*, *Chi. Reg'l Council of Carpenters v. Thorne Assocs., Inc.*, 893 F. Supp. 2d 952, 960 (N.D. Ill. Sept. 25, 2012) ("[Defendant] may well be able to establish, either at the summary judgment or trial stage, that there are circumstances in which an employee does need the capacity to perform the tasks required in the [required] test."). To survive a motion to dismiss, Sharma need only "put the defendant on notice as to the nature of the claim against [it] and the relief sought," *Twombly*, 550 U.S. at 574, and he has met that standard here.[9] Therefore, Count IV will also proceed against the Board.

---

[9] The UIC Defendants also argue in their reply brief that Sharma has not "overcome the UIC Defendants' motion." However, UIC, not Sharma, "bears the burden of establishing that an examination is consistent with business necessity, and that burden is quite high." *Wright*, 798 F.3d at 523.

### III.    Retaliation in Violation of the Ethics Act (Count V)

The Court next turns to Sharma's claim in Count V under the Ethics Act, which prohibits the state and its employees from retaliating against another state employee for reporting misconduct.

### A.    Statute of Limitations

The UIC Defendants first argue that Sharma's Ethics Act claim is barred by the applicable two-year limitations period. *See* 735 ILCS 5/13–202. "Dismissing a complaint as untimely at the pleading stage is an unusual step, since the complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute of limitations defense, questions of timeliness [should be] left for summary judgment or trial." *Id.*

Without the benefit of a complete factual record, the Court declines to dismiss Sharma's complaint on statute of limitations grounds. Generally, the limitations period begins to run when the party seeking relief "knows or reasonably should know of an injury and that it was wrongfully caused." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 192 (Ill. 2002). However, for torts involving a continuing or repeated injury, the limitations period does not begin to run "until the date of the last injury or the date the tortuous acts cease." *Id.* Sharma alleges continuous retaliatory conduct by his superiors at UIC beginning in 2013 and continuing until the cessation of his employment. Therefore, it is conceivable that his retaliation claim accrued on June 28, 2016—the date Sharma learned that he had been discharged at Van Neck and Van Voorhees' request. Sharma filed his first complaint in state court on June 27, 2017, less than two years later. Accordingly, Sharma has not pleaded himself out of court "by alleging facts

sufficient to establish the complaint's tardiness." *Cancer Found. Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009).

### B.    Merits of Ethics Act Claim

Turning to the merits of his claim under the Ethics Act, Sharma must allege that (1) he engaged in protected conduct by "disclos[ing] or threaten[ing] to disclose to a supervisor or to a public body an activity, policy, or practice of any . . . other State employee that [he] reasonably believes is a violation of a law, rule or regulation;" and (2) such conduct was a "contributing factor" in his termination. 5 ILCS 430/15–10; *Hosick v. Chi. State Univ. Bd. of Trs.*, 924 F. Supp. 2d 956, 974 (N.D. Ill. 2013).

Sharma points to two incidents of protected conduct: when he reported the bad-debt issue to his supervisor in 2013 and when he refused to authorize Van Voorhees's improper travel expenses in 2015. (SAC ¶¶ 28, 21–23 at 6, ¶¶ 39–56.) But as to the first incident, Sharma does not allege that by reporting the bad-debt issue, he "reasonably believed that he was reporting a violation of . . . law or regulations." *Wynn v. Ill. Dep't of Human Servs.*, 81 N.E.3d 28, 34 (Ill. App. Ct. 2017). Instead, Sharma merely claims that the codes used to classify bad debts versus insurance adjustments were "outdated." (SAC ¶ 34.) Sharma even acknowledges that UIC subsequently "changed the way it coded these [bad debts] to correct the prior misclassification," indicating that the bad-debts issue occurred due to an administrative error rather than illegal conduct. (SAC ¶ 36.) Therefore, the first alleged incident does not qualify as protected conduct.

As to his refusal to authorize improper travel expenses, Sharma has alleged that he believed Van Voorhees's requests were illegal and violations of state and federal tax laws. (*Id.* ¶ 50.) Sharma also reported the alleged "unethical and illegal acts" committed by Van Voorhees to McNeely, the UIC Ethics Officer. Thus, Sharma has alleged sufficiently that he engaged in

protected conduct. But he nonetheless fails to allege that his act of reporting Van Voorhees's illegal conduct was a contributing factor in Van Voorhees's retaliation against him. According to the SAC, Sharma did not report Van Voorhees to McNeely until almost one month after he was subjected to examinations and placed on administrative leave. (*Id.* ¶ 147.) And Sharma does not allege that he reported Van Voorhees to anyone else prior to that point; instead, Sharma merely claims that he refused to obey Van Voorhees or told Van Voorhees that he wished to follow UIC policies. (*Id.* ¶¶ 39, 42, 55.) A retaliation claim cannot be based solely on a confrontation with the wrongdoer about his illegal conduct. *See, e.g.*, *Tomas v. Ill. Dep't of Employment Security*, No. 07-cv-04542, 2018 WL 1508534, at *12 (N.D. Ill. Mar. 27, 2018) (dismissing retaliation claim where "[Plaintiff] concedes that she did not disclose [Defendant's illegal conduct] to the OIEG or to the police. Instead, she emailed [Defendant]"). Therefore, Sharma has not stated a claim under the Ethics Act, and Count V is dismissed.

### IV. Deprivation of Fourteenth Amendment Rights (Counts VII and VIII)

Counts VII and VIII allege violations of the Fourteenth Amendment's Equal Protection Clause and the Fifth Amendment's Due Process Clause. As an initial matter, it appears that Sharma intends to assert his constitutional claims in Counts VII and VIII pursuant to 42 U.S.C. § 1983, which provides a federal right of action against the government for civil rights violations. *See Wallace v. Kato*, 549 U.S. 384, 386 (2007). Sharma mistakenly invokes the Fifth Amendment right to due process, when he presumably means to sue under the Fourteenth Amendment, which has its own Due Process Clause. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law."); *Brown v. Chi. Bd. of Educ.*, 973 F. Supp. 2d 870, 873 n.3 (N.D. Ill. 2013) (converting plaintiff's Fifth Amendment due process claim as "really brought under the

17

Fourteenth Amendment"). Thus, the Court construes Counts VII and VIII as § 1983 claims alleging that Defendants violated Sharma's rights under the Fourteenth Amendment's Equal Protection and Due Process Clauses.

### A. Qualified Immunity

It is well established that qualified immunity is an affirmative defense. *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017). Simply stating that "[t]he individual defendants also have qualified immunity which further warrants dismissal" does not carry Defendants' burden of raising this affirmative defense. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008). Further, because the validity of a qualified immunity defense depends on the facts of a case, generally "dismissal at the pleading stage is inappropriate." *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001); *see also Jacobs v. City of Chi.*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal.").

Sharma has alleged that the UIC Defendants violated a clearly established right: the right to be free from discrimination based on race or national origin. *See Tamayo*, 526 F.2d at 1090 ("At the Rule 12(b)(6) stage of the proceedings, however, [Plaintiff] was required only to allege— not prove—the deprivation of a constitutional right."); *Auriemma v. Rice*, 910 F.2d 1449, 1457 (7th Cir. 1990) (holding that "[n]o reasonable police chief could have objectively and reasonably concluded" that he could discriminate against his subordinates based upon race without violating their constitutional rights). Therefore, the Court declines to dismiss Counts VII and VIII on qualified immunity grounds.

### B.     Counts VII and VIII as to Friedman

In his motion, Friedman argues that he cannot be held liable for violating Sharma's constitutional rights because he is not a state actor, and § 1983 only applies to "someone acting under color of state law." *Hanania v. Loren-Maltese*, 212 F.3d 353, 356 (7th Cir. 2000). To show that a private individual acted under color of state law, a plaintiff must establish that: (1) the private individual and a state official reached an understanding to deprive the plaintiff of her constitutional rights, and (2) the private individual was a willful participation in joint activity with the state or its agents. *Id.*

Here, the allegations in Sharma's complaint are insufficient to plausibly suggest that Friedman participated in a conspiracy. Indeed, the only reference to any sort of understanding or agreement between Friedman and any state actor is the allegation that Friedman was "a friend of the person seeking to terminate [Sharma] unjustifiably." (SAC ¶ 136.) With no indications as to the friend's identity, when the agreement between Friedman and his friend was formed, or any terms of the agreement, "[t]he form and scope of the conspiracy are thus almost entirely unknown." *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999); *see also Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (holding that parties pleading a conspiracy must "indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with"). On its own, Sharma's bare allegation that Friedman "is sued for conspiring to deprive Mr. Sharma of various of his constitutional rights" does not satisfy the notice-pleading requirements of Federal Rule of Civil Procedure 8, regardless of whether Sharma has adequately stated a claim against the other Defendants. *Ryan*, 188 F.3d at 860 ("So the question comes down to whether the bare allegation that a defendant conspired with other defendants whose unlawful acts are adequately alleged satisfied Rule 8 as to that defendant. We

think not."). Ultimately, Sharma has not sufficiently pleaded that Friedman was involved in a conspiracy such that he acted under color of state law, which is an essential element of his § 1983 claims against Friedman. Therefore, the Court dismisses Counts VII and VIII against Friedman.

### C.     Counts VII and VIII as to the UIC Defendants

The Court next turns to Sharma's § 1983 claims against the UIC Defendants, who claim that sovereign immunity should apply to protect them from liability. Under the Eleventh Amendment, sovereign immunity protects a state agency and its officials acting in their official capacities from § 1983 suits seeking relief in the form of damages. *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). However, the Eleventh Amendment does not forbid § 1983 suits against state agencies or officials that seek only injunctive relief. *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000). Here, Sharma seeks damages and injunctive relief ordering UIC to reinstate him to his position with full salary and benefits. The Court therefore dismisses any claim for monetary relief against the Board in Counts VII and VIII but allows the claim for injunctive relief to proceed.

As to Azar, Van Neck, and Van Voorhees ("Individual UIC Defendants"), a state official may be sued in his individual capacity under § 1983. *See Novoselsky v. Brown*, 822 F.3d 342, 348 (7th Cir. 2016). To state a claim for personal liability under § 1983, Sharma must allege that the individual UIC Defendants were "personally involved in the deprivation of [his] constitutional rights." *Whitford v. Boglino*, 63 F.3d 527, 530–31 (7th Cir. 1995). Sharma has adequately pleaded personal involvement by Van Voorhees and Van Neck, as required for individual liability: Van Voorhees told Sharma he had to undergo medical examinations lest he be fired, and Van Neck and Van Voorhees requested that the Board discharge Sharma. (SAC ¶¶ 86–87, 196, 198.) But the

SAC contains no allegations regarding Azar's personal involvement in the deprivation of Sharma's constitutional rights. Therefore, the Court dismisses Counts VII and VIII as to Azar.

To plead a *prima facie* case of discrimination under the Equal Protection Clause as asserted in Count VII, Sharma must allege that: (1) he is a member of a protected class, (2) he is otherwise similarly situated to members of the unprotected class, and (3) he was treated differently from individuals not belonging to the protected class. *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005). Sharma has alleged that he, an Asian individual of Indian national origin, was forced to undergo a psychiatric evaluation and terminated, whereas Caucasian employees at UIC, such as Wayne Franklin, Krystal Revai, and Van Neck, "engaged in well documented and complained of verbal abuse and intimidation" but did not suffer the same treatment. (SAC ¶¶ 7, 201–07.) While it may be true that "[m]ore evidence than the mere fact that other employees were not discharged for at best arguably similar misconduct must be demonstrated" at the summary judgment stage, Sharma need not produce any evidence to survive a motion to dismiss. *Twombly*, 550 U.S. at 574; *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 771 (7th Cir. 1994). Sharma has adequately stated a § 1983 claim under the Fourteenth Amendment's Equal Protection Clause.

To establish a due process violation as asserted in Count VIII, Sharma must show that: (1) he has been deprived of a protected interest (2) without due process of law. *See Rebirth Christian Academy Daycare, Inc. v. Brizzi*, 835 F.3d 742, 746 (7th Cir. 2016). "Under Illinois law, a public employee has a protected property interest in his job only if the continued employment is guaranteed by a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge him." *Catinella v. Cty. of Cook, Ill.*, 881 F.3d 514, 518 (7th Cir. 2018). Yet Sharma has not identified any state law, local ordinance, or contract provision that substantively limits UIC's ability to fire him. Instead, he relies solely on his personal

understanding that because he "consistently received the highest evaluations" and his "record was free from discipline," he should not have been subjected to unwarranted evaluations and terminated from his employment. (SAC ¶¶ 247–48.) Sharma also contends that UIC did not follow its own policies when dealing with him. But mere allegations about process cannot convey a property interest under the Fourteenth Amendment. *See Cantinella*, 881 F.3d at 518 ("An employee manual or policy handbook that specifies a set of pre-termination procedures does not create an enforceable property right to a job."). Because he has not sufficiently alleged the deprivation of any protected interest, Sharma's claim under the Fourteenth Amendment's Due Process Clause must be dismissed.

In summary, the Court dismisses Count VII as to Friedman and Azar but allows the claim to proceed as to Van Neck, Van Voorhees, and the Board—the latter with respect to injunctive relief only. The Court dismisses Count VIII as to all Defendants.

## V. Section 1981 Race and National Origin Discrimination (Count IX)

In Count IX, Sharma asserts race and national origin discrimination claims pursuant to 42 U.S.C. § 1981. As a preliminary matter, the Court observes that the SAC does not request any specific relief under this claim. For the purposes of the instant motion, the Court assumes Sharma intends to request approximately the same relief in Count IX as most of the other Counts— namely, ordering UIC to reinstate Sharma to his position with full salary and benefits, awarding compensatory and punitive damages, and awarding attorneys' fees and costs.

### A. Count IX as to Friedman

Section 1981 prohibits racial discrimination in contractual relationships. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). To state a § 1981 claim against Friedman as a private individual, Sharma must plead that: (1) Sharma is a member of a racial minority, (2) Friedman

intended to discriminate against Sharma on the basis of race, and (3) Friedman impaired Sharma's right to make and enforce contracts of employment. *Id.*

Sharma has not alleged any facts to demonstrate that Friedman individually discriminated against him because of his race; nor does he suggest that Friedman interfered with his contractual rights by recommending his termination. Without any such allegations, Sharma's § 1981 claim against Friedman "fails to rise above the speculative level." *Onyango v. Downtown Entm't, LLC*, No. 11-cv-8445, 2012 WL 3133565, at *2 (N.D. Ill. July 30, 2012). Therefore, the Court dismisses Count IX as to Friedman.

### B. Count IX as to the UIC Defendants

The Court now considers Sharma's § 1981 claim against the UIC Defendants. Section 1981 claims for damages cannot be brought against the Board or the individual UIC Defendants acting in their official capacities. *See Campbell v. Forest Preserve Dist. of Cook Cty., Ill.*, 752 F. 3d 665, 667 (7th Cir. 2014). However, as explained above, Sharma may bring an action for injunctive relief against UIC; therefore, the Court dismisses Count IX against the Board to the extent that Sharma seeks any non-injunctive relief.

Sharma also contends that he made a typographical error by failing to assert Count IX against Friedman, Azar, Van Neck, and Van Voorhees in their individual capacities as well. But Sharma still cannot seek damages from the individual UIC Defendants in their individual capacities. The Seventh Circuit has made clear that when a state employee brings an action for damages against his supervisors in their individual capacities, sovereign immunity bars his claims for damages because "the money will flow from the state treasury to the plaintiff." *Haynes v. Ind. Univ.*, 902 F.3d 724, 732(7th Cir. 2018) (internal quotation marks and brackets omitted); *e.g.*, *Omosegbon v. Wells*, 335 F.3d 668 (7th Cir. 2003) (dismissing professor's claim against her

supervisors for backpay and other forms of monetary compensation based on an employment contract). Moreover, Sharma does not dispute that Azar, Van Neck, and Van Voorhees "were not even parties to the contract in their individual capacity[ies]," a fatal blow to Sharma's § 1981 claim. *See Omosegbon*, 335 F.3d at 673.

Therefore, Count IX cannot be maintained against the individual UIC Defendants, even in their individual capacities. The Court dismisses Count IX as to all the UIC Defendants except the Board, against which Sharma may seek only injunctive relief.

## VI. State Common Law Torts (Counts X, XII, and XIII)

The Court next considers Sharma's state law tort claims. Count X alleges interference with contract or with prospective economic advantage, Count XII alleges common law retaliatory discharge, and Count XIII alleges intentional infliction of emotional distress ("IIED").

### A. Preemption by the Illinois Human Rights Act

Defendants first argue that Sharma's state law tort claims should be dismissed as preempted by the Illinois Human Rights Act ("IHRA").

Discrimination and torts such as interference with contract, retaliatory discharge, and IIED are "different wrongs, and so torts that do not depend on a civil rights violation are not preempted." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) (applying Illinois law). "The distinction between claims that are preempted and claims that are not preempted turns on the legal duty that the defendant allegedly breached; that is, if the conduct would be actionable even aside from its character as a civil rights violation . . . ." *Id.*; *compare Quantock v. Shared Mktg. Servs. et al.*, 312 F.3d 899, 902, 905 (7th Cir. 2002) (per curiam) (finding preemption where plaintiff's IIED claim was based solely on incidents of sexual harassment) *with Naeem*, 444 F.3d at 605 (finding no preemption where plaintiff's IIED claim included not just sexual

harassment but also a pattern of behavior including impossible deadlines, setting up obstacles to her performing her job, and sabotaging her work). Here, Sharma has alleged a pattern of behavior by Defendants—including repeatedly pressuring him to ignore UIC policies and procedures, refusing to intervene when co-workers yelled at him, subjecting him to medical examinations, describing him to co-workers as a dangerous and potentially violent individual, and ultimately terminating him. These allegations amount to more than just harassment based on race or national origin. Accordingly, Sharma's state law tort claims are not preempted by the IHRA. And having decided that Sharma's state law tort claims are not preempted, the Court next considers whether Sharma has adequately stated a claim under Counts X, XII, and XIII.

### B.    Interference with Contract or Prospective Economic Advantage (Count X)

In Count X, Sharma alleges that the individual Defendants tortuously interfered with his employment contract or prospective economic advantage."[10] To state a claim for tortious interference under Illinois law, Sharma must plead: (1) a reasonable expectation of entering into a valid business relationship; (2) Defendants' knowledge of Sharma's expectancy; (3) Defendants' purposeful interference that prevents Sharma's legitimate expectancy from ripening into a valid business relationship; and (4) damages to Sharma resulting from such interference. *Botvinick v. Rush Univ. Med. Ctr.*, 574 F.3d 414, 417 (7th Cir. 2009) (citing *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991)).

Sharma has alleged that he had a reasonable expectation of his continued employment at UIC in light of his work history and performance, and that the individual Defendants knew of this expectancy but interfered with his employment by "creating spurious lies about his character and

---

[10] While the SAC may be ambiguous, Sharma clarifies in his opposition brief that he did not intend to assert Count X against the Board.

mental fitness . . . which caused [his termination]." (SAC ¶¶ 257–59.) But in order to state a claim

Sharma must also allege that the individual Defendants' allegedly tortious interference was

directed towards UIC—the third party with whom Sharma had the business expectancy—and not

simply towards Sharma. *See Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503 (7th Cir.

1998). With respect to this essential element, Sharma has alleged that Van Voorhees and Van

Neck signed a request asking the Board to issue Sharma a notice of non-reappointment, which

suffices to show that they directed their allegedly tortious interference towards UIC. But while

Sharma alleges that Azar wanted to terminate him, he does not suggest that Azar asked the Board

to do so. (*See* SAC ¶ 27.) Similarly, although Sharma claims that Friedman falsely accused him

of lying in his psychiatric report, Sharma does not allege that Friedman sent the report to anyone

other than Marder at UHS. (*See id.* ¶¶ 160–63.) Therefore, the Court dismisses Count X against

Azar and Friedman.

Van Voorhees and Van Neck also argue that conditional privilege protects them from

liability under Count X. Under Illinois law, conditional privilege protects managers from personal

liability for decisions made on behalf of their employers. *See Nation v. Am. Capital, Ltd.*, 682

F.3d 648, 651–52 (7th Cir. 2012). However, agents who act in their own personal interests or out

of malice will not be protected. *Delloma v. Consol. Coal Co.*, 996 F.2d 168, 172 (7th Cir. 1993).

Here, Sharma has sufficiently pleaded that Van Voorhees and Van Neck acted maliciously, rather

than in UIC's interest. For example, the SAC alleges that Van Neck wanted to terminate Sharma

for embarrassing him by mentioning the bad debt issue. (SAC ¶¶ 26–27.) Similarly, Sharma

claims that Van Voorhees was displeased with him for his continued refusal to authorize Van

Voorhees' expenses. (*Id.* ¶¶ 39–42, 48–50, 54.) Thus, Sharma has adequately alleged that Van

Voorhees and Van Neck should not be protected by the conditional privilege; whether they in fact

acted on behalf of UIC or out of malicious intent is not an appropriate inquiry at this stage in the litigation. *See, e.g.*, *Ricco v. Sw. Surgery Ctr., LLC*, 73 F. Supp. 3d 961, 974 (N.D. Ill. 2014) ("Whether [Defendant] was pursuing a legitimate interest of the company or whether his actions were malicious and without justification is a question for the jury."). The Court therefore denies the UIC Defendants' motion to dismiss Count X as to Van Neck and Van Voorhees.

## C.    Common Law Retaliatory Discharge (Count XII)

In Count XII, Sharma asserts a claim for retaliatory discharge. Illinois is an at-will employment state, which means that, in general, an employee may be discharged at any time for any reason or none at all. *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 940 (7th Cir. 2002). However, a discharged employee may sue his employer for retaliatory discharge if his discharge was "in retaliation for certain actions that are protected by the public policy of Illinois, including retaliation for complaints about an employer's unlawful conduct." *Id.* at 940–41.

Sharma's common law retaliatory discharge claim fails for the same reasons as his claim for retaliation under the Ethics Act. Sharma contends that Defendants retaliated against him for reporting the bad-debt issue to Raj in 2013 and for refusing to authorize Van Voorhees' expenses. However, Sharma does not allege that the bad-debt issue was the result of unlawful conduct; instead, he only alleges that the misreporting caused "incorrect[]" year-end operating statements and observes that UIC later changed the "outdated" codes used to classify bad debts. (SAC ¶¶ 22, 34.) Nor does Sharma allege that he reported Van Voorhees's conduct before Van Voorhees began retaliating against him. Therefore, Sharma has not stated a valid claim for retaliatory discharge, and the Court dismisses Count XII against all Defendants.[11]

---

[11] Sharma's grounds for a retaliatory discharge claim against Friedman are unclear, and Sharma does not address Friedman's arguments for dismissal of this Count in his response brief. Regardless, Sharma has

## D.     Intentional Infliction of Emotional Distress (Count XIII)

Finally, Sharma asserts an IIED claim in Count XIII against the individual UIC

Defendants and Friedman. Defendants first argue that the claim should be dismissed as untimely,

based on the two-year statute of limitations for IIED claims under Illinois law. *See* 735 ILCS

5/13-202.

As discussed above, dismissal based on a statute of limitations of defense is only

appropriate "where the allegations of the complaint itself set forth everything necessary" to show

tardiness. *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir.

2014). For torts involving a continuing or repeated injury, the statute of limitations does not begin

to run "until the date of the last injury or the date the tortuous acts cease." *Belleville Toyota, Inc.*,

770 N.E.2d at 177. Because Sharma alleges that Defendants repeatedly engaged in tortious

conduct throughout his employment at UIC, it is possible that his IIED claim did not accrue until

June 28, 2016, the date Sharma learned that the Board had granted Van Voorhees and Van Neck's

request for Sharma's termination. Sharma asserted his IIED claim for first time in his First

Amended Complaint in October 2017, less than two years later. Thus, there is a "conceivable set

of facts, consistent with the complaint," that defeats Defendants' statute of limitations defense.

*Sidney Hillman*, 782 F.3d at 928. The Court will not dismiss Sharma's IIED claim on statute of

limitations grounds.

The Court next considers whether Sharma has adequately pleaded his IIED claim. To state

a cause of action for IIED under Illinois law, Sharma must allege that: (1) Defendants' conduct

was "truly extreme and outrageous;" (2) Defendants intended or knew that there was "at least a

---

not adequately stated a claim against Friedman under Count XII, as he does not allege that Friedman was
his employer or supervisor or that Friedman retaliated against him for reporting any unlawful conduct.

high probability that [their] conduct would cause severe emotional distress;" (3) Defendants'
conduct actually caused "*severe* emotional distress." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80
(Ill. 2003) (emphasis in original). Courts apply an objective standard to determine whether
conduct is extreme and outrageous and may dismiss an IIED claim if the alleged conduct is not
sufficiently so. *See Cook v. Winfrey*, 141 F.3d 322, 332 (7th Cir. 1998).

Conduct is extreme and outrageous where it goes "beyond all possible bounds of decency,
and [is] regarded as intolerable in a civilized community." *Swearnigen-El v. Cook Cty. Sheriff's
Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (internal quotation marks omitted). Illinois courts "often
hesitate to find a claim for [IIED] in employment situations" based on concern that "if everyday
job stresses resulting from discipline, personality conflicts, job transfers, or even terminations
could give rise to a cause of action for [IIED], nearly every employee would have a cause of
action." *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App. Ct. 2000).
Accordingly, "in the absence of conduct calculated to coerce an employee to do something illegal,
courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and
outrageous as to give rise to an action for intentional infliction of emotional distress." *Welsh v.
Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999).

In the SAC, Sharma alleges that, on multiple occasions, Van Voorhees asked him to
approve expenses that he believed were "illegal" and in violation of UIC's policies and
procedures. (SAC ¶¶ 39–42, 48–51, 54.) Furthermore, between May 2015 and July 2015, Van
Voorhees exerted repeated and continuous pressure on Sharma to break the law. (*Id.* ¶¶ 51, 54.)
When Sharma would not comply, Van Voorhees subjected him to unwarranted medical
evaluations, told Sharma's co-workers that he was dangerous and potentially violent, and asked
the Board to fire him. (*Id.* ¶¶ 108–09, 269.) Based on these allegations, Van Voorhees's coercive

and retaliatory conduct was extreme and outrageous and meets the standard for an actionable IIED claim.

Sharma does not include similar allegations about the other individual Defendants, however. As to Azar and Van Neck, Sharma merely alleges that they "bad-mouthed" him, wanted to terminate him, and reduced his raise from seven percent to three percent. (*Id.* ¶¶ 27–32.) Such conduct falls well short of being truly extreme or outrageous. *Cf. Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (affirming dismissal of IIED claim where plaintiff alleged she was reprimanded without cause, forced out of a management position, falsely accused of having poor sales, and threatened with discipline); *Shamim v. Siemens Indus., Inc.*, 854 F. Supp. 2d 496, 512–13 (N.D. Ill. 2012) (dismissing IIED claim based on defendant-supervisor subjecting plaintiff to "outbursts of yelling, profanity, and insults about his religion and ethnicity" and making false comments about plaintiff to others). As to Friedman, Sharma contends that Friedman made a "baseless accusation of dishonesty" in his "sham evaluation," which "rises to the level of [IIED]." (Pl.'s Opp. to Def. Friedman's Mot. to Dismiss at 7, Dkt. No. 43.) However, faced with the high standard required to prove an IIED claim, Sharma does not cite any cases suggesting that a one-time accusation of mere dishonesty qualifies as extreme and outrageous conduct. *See McKay v. Town and Country Cadillac, Inc.*, 991 F. Supp. 966, 972 (N.D. Ill. 1997) (dismissing IIED claim where defendant-supervisor accused plaintiff of alcoholism); *Layne v. Builders Plumbing Supply Co.*, 569 N.E.2d 1104, 1108 (Ill. App. Ct. 1991) (affirming dismissal of IIED claim where defendant falsely told police that plaintiff had harassed, assaulted, and verbally threatened a co-worker).

The Court thus dismisses Count XIII against Azar, Friedman, and Van Neck; the claim will proceed as to Van Voorhees only.

## CONCLUSION

For the foregoing reasons, Friedman's motion to dismiss (Dkt. No. 32) is granted in its entirety and the UIC Defendants' motion to dismiss (Dkt. No. 23) is granted in part and denied in part. Specifically, the UIC Defendants' motion is denied as to Counts I, III, and IV; those counts survive along with Count II (which was not the subject of the motion to dismiss). The UIC Defendants' motion is granted as to Counts V, VIII and XII; those counts are dismissed. In addition, Count VII is dismissed as to Defendants Azar and Friedman only, and will proceed against the Board only to the extent Sharma seeks injunctive relief. Count IX is dismissed as to all Defendants except the Board, against whom Sharma may seek injunctive relief only. Count X is dismissed as to Azar and Friedman only. And finally, Count XIII is dismissed as to all Defendants except Van Voorhees. The dismissals are without prejudice.

ENTERED:

Dated: August 26, 2019

_____
Andrea R. Wood
United States District Judge