**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Suresh Sharma, | |
| *Plaintiff,* | No. 17 CV 7378 |
| v. | Judge Lindsay C. Jenkins |
| Board of Trustees of the University of Illinois, *et al.,* | |
| *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

Suresh Sharma, a former administrative professional at the University of Illinois at Chicago ("UIC"), brings this employment discrimination suit against the Board of Trustees of the University of Illinois (the "Board"), Associate Dean of Administration Todd Van Neck, and Dr. Benjamin Van Voorhees, at the time the interim head of the pediatrics department at UIC's College of Medicine (collectively, "Defendants").[1] Sharma brings (1) Title VII race and national-origin discrimination claims against the Board, (2) an Americans with Disabilities Act ("ADA") claim against the Board, (3) an equal protection claim pursuant to 42 U.S.C. § 1983 against all three Defendants, and (4) Illinois law claims for tortious interference and intentional infliction of emotional distress ("IIED") against Dr. Van Voorhees. [*See* Dkt. 186 at 2.] Before the Court is Defendants' motion for summary judgment. [Dkt. 194.] For the reasons stated below, that motion is granted.

---

[1]    This case has been pared down by the Court dismissing several claims in Sharma's second amended complaint and Sharma voluntarily dismissing others. [Dkt. 76, Dkt. 189.]

## I.    Background

This lawsuit centers around actions Defendants took regarding Sharma's employment at UIC, primarily requiring him to undergo a fitness for duty ("FFD") evaluation, placing him on paid administrative leave, and declining to renew his appointment at UIC. [*See* Dkt. 195 at 1; Dkt. 213 at 5, 7.] The Court draws on the parties' Local Rule 56.1 filings to recount the facts.[2] In doing so, the Court notes which material facts are in dispute and whether disputes are supported by admissible evidence. *See Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). As will become clear, a recurring issue is whether certain statements are hearsay, out-of-court statements offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Hearsay is inadmissible unless an exception to the hearsay rule applies, *see* Fed. R. Evid. 801(d), 802–804, but an out-of-court statement is not hearsay if it is offered for a purpose other than its truth, such as its effect on a listener, *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019); *Poullard v. McDonald*, 829 F.3d 844, 858 n.4 (7th Cir. 2016). This distinction matters because "inadmissible hearsay evidence does not create a factual dispute at summary judgment." *Wash. Cnty. Water Co. v. City of Sparta*, 77 F.4th 519, 529 (7th Cir. 2023) (citation omitted).

### A.    Sharma's Employment at UIC

Sharma, who is an immigrant and of Indian descent, began working at UIC in 2005. [Dkt. 214 ¶ 1; *see* Dkt. 213 at 1.] Chief of Pediatrics Dr. Usha Raj—also of Indian

---

[2]    The evidence here includes some sensitive information, such as the content of medical records, which have been filed under seal, with redacted versions filed publicly. For simplicity, the Court generally cites the public versions, even when the cited material has been redacted. The parties may consult the sealed versions to see the specific material cited.

2

descent—brought him into the College of Medicine in 2008; in 2011, Sharma became Director of Administrative Operations and began working with Dr. Van Voorhees. [Dkt. 214 ¶¶ 1–3; Dkt. 217 ¶ 1.] Dr. Raj hired Sharma to "assist her in creating fiscal controls to ensure proper billing and income and to monitor expenditures" in the pediatrics department, which previously lacked controls on spending. [Dkt. 217 ¶ 1.] "Sharma was required to ensure that all funds expended … were correctly spent and properly accounted to the correct funding source." [*Id.*] According to Sharma, he discovered "a long-standing error in fund accounting," and in January 2015, "UIC agreed that certain insurance write-offs had been mischaracterized as 'bad debt' and changed the way they were coded." [*Id.* ¶¶ 2–3.][3] Sharma believes that exposing the bad debt issue upset Associate Dean Van Neck because it made him look bad. [*Id.*] Similarly, Sharma thinks he crossed Dr. Van Voorhees by insisting on conformity with financial policies that Dr. Van Voorhees did not want to abide by. [*Id.* ¶¶ 7–8.]

In mid-February 2015, Dr. Raj was told to step down as Chief of Pediatrics. [*See* Dkt. 214 ¶ 3; Dkt. 217 ¶ 6.][4] She later filed an Equal Employment Opportunity

---

[3]     Defendants dispute that UIC had mischaracterized the debt [Dkt. 217 ¶ 3], but this distinction is not material.

[4]     According to Sharma, Dr. Raj was forced to step down as a result of complaints about her management style made by high-level UIC employees, including Dr. Van Voorhees, which were relayed to Dr. Raj several months prior to her termination by UIC College of Medicine Dean Dimitri Azar. [Dkt. 214 ¶ 3; Dkt. 217 ¶¶ 4–5; Raj Dep. at 105–09, Dkt. 234-2 at A463–64.] Defendants argue that Dean Azar's statements are inadmissible hearsay [Dkt. 217 ¶ 5], but the Court disagrees. Statements made by an opposing party's agent about matters within the scope of the agency agreement are not hearsay. Fed. R. Evid. 801(d)(2)(D); *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 622 (7th Cir. 2003). It is reasonable to infer that Dean Azar's role included giving feedback to department heads within the College of Medicine, so for present purposes, this evidence is admissible. By contrast, the Court disregards Sharma's separate allegation that Dr. Raj was "targeted" by white faculty members because it lacks evidentiary support. [*See* Dkt. 217 ¶ 4.]

Commission ("EEOC") charge, alleging discrimination based on gender, race, and national origin and ancestry. [Dkt. 233-2 at A927–32.][5] Dr. Van Voorhees became interim head of the department and inherited what he described as a "disfunction[al]" environment, including concerns by faculty "about how the department was being run and organized and the tone." [Van Voorhees Dep. at 38, Dkt. 234-2 at A557; Dkt. 214 ¶¶ 3, 13.][6] To address these concerns, he brought in two consultants from other UIC departments, Juanita LeCrone and Meg Oberholtzer. [Dkt. 214 ¶ 14.]

### B.    Reports of Sharma's Behavior

During the spring of 2015, complaints from UIC employees about threatening and inappropriate behavior by Sharma began to come to the attention of Dr. Van Voorhees and the consultants. [Dkt. 214 ¶ 16.] In April, they created a "master log" to collect these complaints, supporting documentation, and their comments; Sharma disputes the accuracy of the log, but he acknowledges that the information therein was compiled by Dr. Van Voorhees, LeCrone, and Oberholtzer. [*Id.* ¶¶ 19–20; Dkt. 234-2 at A656–841 (several iterations of the master log).] The Court details these complaints and discusses Sharma's disputes about them.

### 1.    Complaints via Fanti

Marci Fanti, the director of human resources for the College of Medicine, testified that employees made complaints about Sharma in 2014 and early 2015; that she did not take contemporaneous notes about the complaints; and that she compiled

---

[5]    Sharma represents that Dr. Raj's case settled, but no record evidence supports this, so the Court will disregard it. [*See* Dkt. 217 ¶ 6.]
[6]    Sharma objected to Defendants' paraphrasing Dr. Van Voorhes's testimony. [Dkt. 214 ¶ 13.] The Court has quoted him directly.

a summary document of consistent information across multiple complaints. [Dkt. 214 ¶ 10; Fanti Dep. at 43, Dkt. 234-1 at A222; Dkt. 234-2 at A880–91.] Fanti testified that these individuals made the following complaints about Sharma's behavior:

- Christina Roberts: "[H]ostile work environment. Tones, berating, belittling, just a general abuse of authority." [Fanti Dep. at 34, Dkt. 234-1 at A220.]
- Jessica Watkins: "Similar to those of Christina Roberts," which she summarized in an email afterward. [*Id.* at 36–37, Dkt. 234-1 at A220–21.]
- Laura Ravens: "Her complaints and concerns were consistent with previous meetings," and she provided summary documentation. [*Id.* at 40, Dkt. 234-1 at A221.]
- Jeffrey Dodler: "Belittling, berating, being yelled at." [*Id.* at 41, Dkt. 234-1 at A222.]
- Kali Ludwig and Monika Marko: Fanti stated that they complained but was not asked about specifics. [*Id.* at 41–42, Dkt. 234-1 at A222.]
- Ann Lindner: Formal complaint about "[t]he hostile work environment and the … way she was being treated." [*Id.* at 43–44, Dkt. 234-1 at A222.]
- Nivid Thakar: Fanti said he made a formal complaint, but she was not asked about specifics. [*Id.* at 50, Dkt. 234-1 at A224.]
- Piyush Hargunani: Formal complaint about Sharma "raising his voice, yelling at individuals in front of other people, managing meetings … [like a] dictatorship," and "interfering or impeding some business processes for particular individuals." [*Id.* at 50–51, Dkt. 234-1 at A224.]

Fanti testified that she attempted to meet with Dr. Raj, who was then Sharma's supervisor, about the complaints from Wakins and Ravens. [*Id.* at 37–40, Dkt. 234-1 at A221.] After Dr. Van Voorhees became interim head of pediatrics, Fanti relayed the complaints she had received during 2014 and early 2015 to him. [Dkt. 214 ¶ 16.]

Sharma tries to dispute all these allegations, but he can only genuinely dispute some of them. There is a genuine dispute about the substance of the complaints— that is, whether Sharma said and did what the reports say. [*See id.* ¶ 10.] There is also a genuine dispute as to whether Fanti contacted Dr. Raj about the complaints. Dr. Raj testified that she does not remember Fanti reaching out to her or that ever

receiving any complaint about Sharma. [Raj Dep. at 90–95; Dkt. 234-2 at A460–61.] While not remembering whether something happened is not the same as remembering that it did not happen, a reasonable jury could credit Dr. Raj's account, so the Court assumes that Fanti did not contact Dr. Raj for purposes of summary judgment.

But Sharma lacks admissible evidence to dispute Fanti's testimony that these individuals made complaints to her or that she relayed those complaints to Dr. Van Voorhees. Sharma points out that Fanti lacks contemporaneous notes or other documentary evidence corroborating the existence of the complaints and that some of her documentation "contains numerous internal inconsistencies, no names, no dates, and only vague references to complaints." [Dkt. 214 ¶¶ 10, 16.] But while supporting documentation would bolster the credibility of Fanti's testimony, the lack of such material does not prove she is lying, and simply calling a witness a liar does not defeat summary judgment. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021) ("Igasaki essentially accuses Forester of lying …, yet he fails to provide any evidence. Conclusory allegations like these alone cannot defeat a motion for summary judgment." (cleaned up)). Thus, while the substance of the complaints is disputed, there is no genuine dispute as to the *fact* that Fanti received complaints about Sharma's behavior during 2014 and early 2015 and passed those complaints along to Dr. Van Vorhees. *See Weaver*, 28 F.4th at 820.

### 2. Lindner's Complaints

Ann Lindner, an assistant who worked with Sharma, made several reports about Sharma's behavior. She testified that she complained to Fanti by phone when

she believed Sharma "had violated federal law by attacking me on race, gender religion." [Lindner Dep. at 37–38, Dkt. 234-1 at A355–56.] Lindner recounted an incident in which a white Christian woman nurse self-reported a HIPAA violation, and Lindner typed a warning letter dictated by Sharma. Sharma "became very angry because somehow I had misunderstood what he wanted me to do," and then "he started yelling about how white women just kept making messes and other people had to clean up after them and didn't our religion teach us a proper work ethic." [*Id.* at 38–39, Dkt. 234-1 at A356.]

Lindner also testified that after Sharma was put on leave, LeCrone suggested she "write out in more detail to explain some of the things that had gone on when I was working directly for Suresh Sharma." [*Id.* at 22, Dkt. 234-1 at A352; *see* Dkt. 214 ¶ 15.] In a memo dated July 21, 2015 and addressed to Fanti and LeCrone, Lindner reported an incident involving behavior she believed was unethical. She stated that Sharma was aware that her grandchild had recently been born and he wanted to arrange for her to travel to New York City to visit her grandchild:

> It was vaguely put in the context of 'professional development' … he has been encouraging his staff to get more training to enhance skills and/or shore up areas in which they could use improvement. But he wasn't requiring me to officially enroll in a workshop, seminar, or class. It would be fine if I just visited a children's hospital or attended some kind of event that was even remotely related to children. He clearly emphasized that his real purpose as to provide me with a round-trip airline ticket to New York City, and pay for my lodging and meals. Furthermore he told me I could have at least a week of or even more of time away from the office without using my vacation time or personal days.

[Dkt. 234-1 at A382 (ellipsis in original).] Lindner believed Sharma's proposal to be an "abuse of resources (both expense and time)" and "an encouragement to

misappropriate University resources for a non-business use." [*Id.* at A382.] She also relayed an incident in which Sharma gave her and another employee gifts that she suspected to have come from a batch of toys donated for needy children. [*Id.* at A383.]

In a second memo to Fanti and LeCrone, dated July 22, 2015, Lindner gave a fuller account of her view of Sharma's behavior. She referred to a report she previously made to Fanti in which she "believed Mr. Sharma had broken the law regarding discrimination on the basis of race, religion, sex, and age"; she added:

> I believe the University has policies to prevent, correct, and discipline incidents of harassment, including emotional harassment, when the educational and/or work experience is being compromised …. I furthermore feel a duty to make you aware of abuses of power and authority that have been entrusted by the University.

[*Id.* at A384.] Lindner stated that "Mr. Sharma was very open about physical and emotional ailments," and "[h]e many times stated directly that he was stressed, upset, angry, etc." [*Id.* at A385.] Lindner stated that "there were never any physical threats against me. … The most upsetting part of the relationship for me was anger. His body language and facial demeanor expressed deep rage, and he yelled loudly and on a regular basis." [*Id.*] She acknowledged that

> many of the situations I'm about to describe might be given a more positive spin. However it was the tone that made me uncomfortable. … I felt that his goal was to manipulate persons and/or situations in a vindictive way. I often felt threatened myself and/or that he would use me to threaten others in ways that were irrelevant to job performance. I was very fearful of consequences or of unpleasant situations … being created that were not based on any reality that I could perceive.

[*Id.*] She then detailed specific, recurring concerns about Sharma's behavior, such as:

- Sharma "would disclose embarrassing information in meeting[s] that didn't have anything to do with the topic being discussed (e.g., a colleague's low pay, the source of my salary)."

8

- He "had strong reactions to any real or imagined security breach," which "[s]ometimes … seemed based on gender or race. As a woman, he forbid me to stay in the building on my own. He was very concerned about me living in the city when there were riots in another town …."
- Sharma "would often single out someone to 'go after.'"
- "Once he took of[f] his shoe and sock and showed me his bare foot because he was concerned about, as I recall, an in-grown toenail."
- "A colleague was called to a [work-related] meeting that I also attended … but somehow the focus was shifted … to his [immigration] status." In regard to that employee's immigration status, "Mr. Sharma would tell me: 'They need to pray to determine whether its' God['s] will that they should stay in America or go back to their original country.'"

[*Id.* at A385–87.]

Sharma disputes the substance of Lindner's testimony about him [*see* Dkt. 214 ¶ 15], and as above, the Court will assume for present purposes that Sharma did not engage in any of the behavior he denies. But Sharma lacks any evidence to dispute that Lindner complained to Fanti, wrote the memos, or presented them to Fanti and LeCrone. He points out that Lindner's written memos do not recount what he allegedly said about white Christian women [*id.*], but Lindner's July 22, 2015 does refer that incident [Dkt. 234-1 at A384]. And in any event, not mentioning a specific incident in a written report does not necessarily prove it did not happen. *See Igasaki*, 988 F.3d at 956.[7] Therefore, there is no genuine dispute as to whether Lindner

---

[7]    In her deposition, Lindner testified that she regularly heard Sharma using profanity, but she did not report that behavior to Fanti or include them in her memos. [Lindner Dep. at 98–105, Dkt. 234-1 at A371–73.] Sharma denies cursing, so for summary judgment purposes, the Court disregards Lindner's testimony about Sharma's use of profanity.

   There is one conspicuous absence in Lindner's deposition testimony and her memos, however. Dr. Van Voorhees testified that on one occasion he found Lindner crying because Sharma had yelled at her. [Dkt. 214 ¶ 25.] Sharma denies doing so, and Lindner testified that the only time she "complain[ed] to anybody about Mr. Sharma yelling and cursing" was in her July 22, 2015 memo. [Lindner Dep. at 105–06, Dkt. 234-1 at A372–73.] The memos lack any mention of Sharma yelling at her and making her cry. From this evidence, a jury could reasonably infer that Sharma did not cause Lindner to cry, so for purposes of ruling on Defendants' motion, the Court disregards this evidence.

complained to Fanti about Sharma's comments about the nurse or whether she sent memos to Fanti and LeCrone about Sharma's conduct.

### 3. Hargunani's Complaints

Piyush Hargunani, a project coordinator, testified that he met with LeCrone around July 14, 2015; he reported complaints about Sharma's behavior, including threats of violence made several years earlier; and LeCrone provided him with a one-page document after the meeting, which he used to draft a three-page statement that he signed and submitted to Fanti. [Dkt. 214 ¶¶ 28, 32–34; Hargunani Dep. at 25–26, 95–104, Dkt. 234-1 at A272–73, A290–92; Dkt. 233-1 at A309–10 (one-page document); Dkt. 234-1 at A306–08 (three-page document).] The document Hargunani prepared stated, in part:

> I … report administratively to Suresh Sharma. In February 2015, when Dr. Van Voorhees became Interim Head of Department of Pediatrics, I noticed a change in the way Suresh managed the staff. … Suresh has on multiple occasions stopped me to work on [projects Dr. Van Voorhees assigned me to] and stated he has the ultimate authority about my position, that he has the power to terminate my position.
>
> Suresh had recently asked me to write damaging emails about Dr. Van Voorhees and other employees …; I have refused to write these emails. In retaliation for my refusal, Suresh is now threatening to demote me and limiting my job responsibilities …. In the past on numerous occasions he has mentioned that if I do not comply, he has the power to stop renewal of my H1B visa after November 2017. …
>
> I feel that my job and my physical well-being is threatened by Suresh Sharma; additionally, Mr. Sharma knows my personal home address. He has called my cell phone multiple times over the weekend and harassed me at length related to non-work issues. …
>
> Few years back, Suresh was delaying my job appointment and visa process, and so I asked Dr. Usha Raj … to intervene. When Suresh Sharma came to know about it he threatened me of physical harm

(cutting into pieces) if I complain to Dr. Raj about him again (in front of other employee). …

Suresh continued to use my dependency on visa sponsorship as a means to control me in the office. … Historically, any time my reappointment approached, Suresh enforced additional workload on me and reminded me that it is very easy not to reappoint these types of visas.

[Dkt. 234-1 at A306–08; *see* Hargunani Dep. at 125, Dkt. 234-1 at A297 ("[Sharma] just came out furious from Dr. Raj's office. He started shouting like a mad person, like, pointing fingers. He was all red. His eyes were all red. He said in Hindi (foreign language spoken). That means cut you into pieces and bury in the grave.").]

Again, Sharma denies the substance of Hargunani's reports, and he notes ambiguity as to whether LeCrone or Dr. Van Voorhees reached out to Hargunani [Dkt. 214 ¶ 28] and inconsistency between Hargunani's testimony that Fanti drafted the shorter document and an email from Fanti saying that she and Hargunani "draft[ed] th[e] document together" [*id.* ¶¶ 33–34; Dkt. 234-2 at A651]. But Sharma has produced no evidence contradicting Hargunani's testimony that he drafted and sent the three-page document to Fanti and that Dr. Van Voorhees was aware of the substance of Hargunani's reports. Thus, while there is a genuine dispute about the truth of Hargunani's allegations, there is no dispute that he made these complaints.

### 4.    **Thakar's Complaints**

Nivid Thakar, a human resources employee in the pediatrics department, testified that he contacted LeCrone with concerns about Sharma's behavior and later met with Fanti regarding his concerns. [Dkt. 214 ¶¶ 38–39.] Sharma's alleged behavior included: saying he would "f*** the person so hard, they'll feel it for the rest of their lives" about someone he was upset with; threatening in Hindi to cut

11

Hargunani into pieces and bury him; attempting to and threatening to interfere with Hargunani's visa; and using an inappropriate tone and berating communication style. [*Id.* ¶ 39.] Thakar explained that he did not report Sharma's behavior sooner because he feared reprisal. [*Id.* ¶ 40.] Thakar also submitted a signed statement detailing Sharma's alleged behavior. [Dkt. 233-1 at A510–12.] As before, Sharma denies the substance of these allegations but produces no evidence to dispute the fact that Thakar made the reports he testified about. [*See* Dkt. 214 ¶ 39 (specifically denying every allegation but citing only his own deposition and declaration, except for one citation to Dr. Raj's deposition for the proposition that she received no reports of Sharma causing a hostile work environment).][8]

### 5.    Other Complaints Captured in the Master Log

The master log contains other complaints, including:

- Jordan Henry, Dr. Van Voorhees's assistant, reported that Sharma said, "Do these people not know the power I have? I can take these people out at any time. [LeCrone] said my employees said bad things about me? I demand to know who so I can take action." [*Id.* ¶ 22; Dkt. 234-2 at A667.]
- Three individuals including Dr. Diego Izze Ludlow contacted Dr. Van Voorhees regarding Sharma's behavior in a meeting. The master log contains a message attributed to Dr. Ludlow: "About half of the meeting was [Sharma] aggressively expressing the importance of his office, which no one was challenging. … His demeanor and way to interact with faculty is concerning …." [Dkt. 214 ¶ 26; Dkt. 234-2 at A761–62.]
- An entry attributes to Dr. Mary Lou Schmidt the statement that "Laura [Ravens] brought into private meeting with [Sharma] with two [w]itnesses. Very intimidated." [Dkt. 214 ¶ 27; Dkt. 234-2 at A763.]

---

[8]    Sharma asserts that Thakar was terminated in 2019 for falsifying overtime records. [Dkt. 217 ¶ 25.] Thakar testified that after he was charged with overreporting overtime hours, he came to an agreement with UIC that he would resign. [Thakar Dep. at 21–23, Dkt. 234-2 at A475–76.] Whatever the circumstances, Thakar's departure from UIC is irrelevant here because Sharma has pointed to no evidence showing that any Defendant knew about Thakar's overtime practices when it was making decisions with respect to Sharma.

Additionally, Dr. Van Voorhees testified that he counseled Sharma regularly regarding his behavior, and there are entries by Dr. Van Voorhees in the master log referring to what he considered to be counseling. [Dkt. 214 ¶ 17.]

Sharma denies the truth of these entries, but he acknowledges that they appear in the log. He also denies that Dr. Van Voorhees counseled him and notes that "there is not a single email in the log from Dr. Van Voorhees to Plaintiff that can be described as coaching." [*Id.*] While the log reflects that Dr. Van Voorhees described his own counseling efforts, it contains no communication between Sharma and Van Voorhees that expressly discusses counseling. Without such evidence, there is a genuine dispute as to whether Dr. Van Voorhees counseled Sharma.

*   *   *

In sum, while the truth of the complaints about Sharma are hotly disputed, Sharma has largely failed to raise a genuine dispute as to whether these complaints were made or conveyed to Dr. Van Voorhees or the individuals working with him on Sharma's case. Thus, as will be discussed below, only to the extent that the accuracy of the complaints—as opposed to their existence—is material will a trial be necessary.

### C.   Sharma's Emails

Meanwhile, on May 3, 2015, Sharma sent Dr. Van Voorhees an email and copied Nivid Thakar. [Dkt. 214 ¶ 23.] The email stated:

> Dear Dr. Voorhees,
>
> As already discussed with you several times, I am stressed out and feel harassed because of recent instances happening in the department for the past few weeks. Inappropriate behavior and intimidating, abusive work environment is constantly being built in the form of interpersonal meetings and email exchange by the newly appointed consultants. As

13

you well know, I have given my valuable 7 years to the Department of Pediatrics serving with integrity, objectivity, and distinction. Whenever, I take a task, I lay an objective to be completed in a specified time frame and am proud to say that I accomplish it with excellence. I respect people around me and expect the same. In the past few weeks I am very disturbed the way things are being thrown at me.

Meg Oberholtzer and Juanita Lecrone were introduced to the department by you as consultants to work closely with me/section chiefs and provide a summary of the report as an addition to overall department plan. I do not see things happening in that direction. From the very beginning I have tried my best to cooperate with them even though till date I have not understood their detailed scope of work. Rather, they do not miss a single opportunity to let me down and portraying a blame game (in the form of emails and attacking in personal interaction) rather than working as a team and in a spirit of true enterprise. I am too stressed and feel mentally disturbed by these games happening around me. I would like a third party to intervene to come to a resolution. Thereby, I request Mr. Nivid Thakar to initiate a confidential meeting with Office for Access and Equity [("OAE")] to resolve the interpersonal conflict and communication differences (cc'ing Ms. Caryn Bills from OAE). I strongly feel that the intervention of the third party will be helpful.

[Dkt. 233-1 at A649–50.] Sharma points to no evidence that OAE offers confidential third-party intervention of the type he requested. [*Cf.* Dkt. 217 ¶¶ 14–15, 20.]

On May 8, 2015, Sharma emailed Dr. Van Voorhees about an email Dr. Van Voorhees had sent several UIC employees stating that they had "received the budget from Nivid [Thakar]" and signing on behalf of "Suresh [Sharma] (Administration)." [Dkt. 234-2 at A759–61.] Sharma's email sought to

clarify two things. I spent days/nights preparing the budget and sent it. It is not Nivid who sent it. Also, in the signatures, I see 'Suresh (Administration)'. Can you clarify who is/has been taking care of Finance of all the divisions/department for the past seven years? I am not comfortable with this and feel stressed. There may be a misunderstanding on my part so want to be clear. As it is, I am going through a lot with my son being in the hospital.

[*Id.*]

14

Sharma does not dispute that he sent these emails, but he argues that Defendants have mischaracterized them and their context. [Dkt. 214 ¶¶ 23–24.] Sharma is not a native English speaker, and he says that "when he used the phrase 'mentally disturbed' he meant to convey that he was stressed and anxious" [Dkt. 217 ¶ 20], and that he made "a poor choice of words" [Sharma Decl. ¶ 16, Dkt. 233-2 at A920]. As Defendants note, Sharma's explanations about the meaning of his emails are not competent evidence about how his words were understood at the time, and he points to no evidence that he clarified his words' meaning contemporaneously. [Dkt. 217 ¶ 20.]

### D. The FFD and Psychological Evaluations

In mid-July 2015, UIC employees including Dr. Van Voorhees, Van Ness, and Fanti met regarding the allegations about Sharma. [Dkt. 214 ¶¶ 42–44.] Some details about the meeting or meetings are disputed, such as who was present and whether the meetings were conducted by the Faculty Staff Response Team or Threat Assessment Team. [*Id.*; *see id.* ¶¶ 5–6.] These disputes are largely immaterial, and to the extent that there is a genuine dispute about who made decisions regarding Sharma, for summary judgment purposes, the Court accepts Sharma's account about decision-making or attributes decisions to all Defendants. Sharma's position is that Dr. Van Voorhees made the ultimate decision to place Sharma on paid administrative leave and require him to undergo a FFD evaluation. [Dkt. 214 ¶¶ 42–44.]

The parties also dispute many of the facts regarding the FFD evaluation, and the Court adopts Sharma's version of the facts for present purposes. On July 17, 2015, Sharma says he was ordered to leave a budget meeting by Dr. Van Voorhees and

escorted to UIC's University Health Services for an FFD evaluation. [Sharma Dep. at 186–92, Dkt. 234-1 at A49–50.] When Sharma arrived, he met Dr. David Marder and Trinette Zahakaylo, an advanced practice nurse. [*Id.* at 192, Dkt. 234-1 at A50.] Dr. Van Voorhees rudely demanded Sharma's keys and badge, then left him with Dr. Marder and Zahakaylo for an FFD evaluation. [*Id.* at 192–93, Dkt. 234-1 at A50; Dkt. 214 ¶ 52.] Sharma attended further FFD appointments on July 21, July 30, August 20, and August 26 [Dkt. 214 ¶ 50; Dkt. 200 at A629–38.] Zahakaylo's notes from the first three sessions indicate that Sharma might need to complete a forensic psychological evaluation, and notes from every session state that the plan includes Sharma remaining off duty for the time being. [Dkt. 200 at A629–38.]

Dr. Van Voorhees directed Sharma to attend a forensic psychological examination with Dr. Alan Friedman; because Sharma was on paid leave, if he did not comply, he could be terminated. [Dkt. 214 ¶ 53.] Sharma met with Dr. Friedman on August 10, 2015 and underwent two psychological tests, and they met again on August 18. [*Id.* ¶ 54; Dkt. 201 at A903.] Dr. Friedman determined that, while Sharma scored in the normal ranges on both tests, his answers indicated defensiveness rather than honesty, so the test results were invalid. His report stated, in part:

> It should be noted that during both interviews with Mr. Sharma, he appeared to be defensive and manifested rapid and pressured speech. He appeared to be agitated and was overly verbose. He appeared indignant for being referred for the fitness for duty evaluation, and appeared to lack any insight, whatsoever, regarding how he might be affecting others with the various outbursts that were related to him ….

> Mr. Sharma completed two psychological tests, both of which … [are] designed to detect whether the test-taker is answering the items in a defensive or open and honest manner. Both tests were invalid, based upon Mr. Sharma's high level of defensiveness in answering the items.

… [One test] produced an extremely elevated defensiveness index, based upon his approach to project a positive impression. … As a result of his high level of defensiveness, all of his clinical scales were completely suppressed, indicating that his profile was within the normal limit range. However, based upon his high level of defensiveness, this test cannot be considered valid for interpretation.

… Very similar[ly,] … Mr. Sharma also produced an invalid profile [on the second test]. He grossly elevated the validity scales, suggesting that he was highly defensive. He endorsed 13 out of the 15 items on the Lie Scale, which invalidates the test. The Lie Scale consists of items that reflect minor moral faults to which most people admit[,] … suggest[ing] that Mr. Sharma approached the test with an intense need to present a good front, and to deny having any type of personality flaw or lack of integrity. His score suggests an intentional effort to misrepresent himself and … his test-taking approach distorted the [test] results. Mr. Sharma also elevated another … scale …, indicating that Mr. Sharma was trying to present himself as having a good psychological adjustment and mental health, despite the stress that he is obviously experiencing with his present employer and the stress of a fitness for duty evaluation. …

While he completed the inventories, he did not complete them in a cooperative and honest fashion, rendering it impossible to determine the exact nature of any type of disability, if one is present.

Because Mr. Sharma did not completely cooperate with this examination, it is impossible to render a finding of his being fit for duty at this time.

[Dkt. 201 at A908–10.] Sharma disputes the substance of Dr. Friedman's findings, but he admits that Dr. Friedman made those findings. [Dkt. 214 ¶¶ 55–59.]

Dr. Marder reviewed Dr. Friedman's report and on September 15, 2015 sent an email stating:

It appears that Mr. Sharma was not forthright in his answers and may have deliberately lied though he had signed an agreement … that he would be truthful in his responses. … As a result I am also unable to find him fit for duty and have terminated future meetings with him since he has insisted that he only told the truth throughout the entire evaluation."

17

[Dkt. 200 at A640.] Sharma acknowledges that Dr. Marder made this finding. [Dkt. 214 ¶ 60.]

### E. Sharma's Non-Reappointment

At UIC, academic professionals like Sharma are appointed for a period of time, up to one year, and are entitled to notice—12 months in Sharma's case—in advance of non-reappointment. [*Id.* ¶¶ 61–62, 64–65.] In September 2015, Dr. Van Voorhees and Daniel Harper, a human resources employee, met with Sharma to propose a separation agreement, which Sharma declined. [Dkt. 217 ¶ 36.][9] On June 29, 2016, Dr. Van Voorhees and Van Neck gave Sharma a notice of non-reappointment, and his employment ended a year later. [Dkt. 214 ¶ 66.]

### F. The 3% Raise

Separate from the sequence of events surrounding Sharma's paid leave, FFD evaluation, and non-reappointment, Sharma alleges that he should have received a higher raise in 2014 than he did. [*Id.* ¶ 67.] Dr. Raj, then Chief of Pediatrics, recommended Sharma receive a 7% raise, but he received a 3% raise instead. The parties dispute who decided Sharma would receive this raise; the Court adopts Sharma's position, which is that Van Neck approved the raise. [*Id.* ¶¶ 68–70.]

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323

---

[9] The parties dispute whether this separation agreement would have truncated Sharma's notice rights [Dkt. 217 ¶ 36], but this dispute is immaterial.

(1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted).

## III.   Analysis

Sharma's surviving claims are for: (1) race and national-origin discrimination in violation of Title VII, (2) disability discrimination in violation of the ADA, (3) an equal protection violation pursuant to 42 U.S.C. § 1983, and (4) tortious interference and IIED under Illinois law. The Court considers each in turn.

### A.   Title VII

The Court follows the parties' lead in analyzing Sharma's Title VII claims for race and national-origin discrimination together. [*See* Dkt. 195 at 6; Dkt. 213 at 8.][10] Title VII of the Civil Rights Act of 1964 makes it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022). Sharma will survive summary judgment if "the evidence would permit a

---

[10]     Sharma brings these claims against the Board only, but the relevant actions were taken by individuals. The Board is entitled to summary judgment even if all the relevant individuals' conduct is attributed to it, so the Court refers to individuals' conduct without attempting to precisely delineate which conduct is attributable to the Board.

reasonable factfinder to conclude that [his] race [or national origin] caused the discharge or other adverse employment action." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (cleaned up).

### 1. Analytical Framework

A Title VII plaintiff may either "prove discrimination in a holistic fashion" under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), or rely on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework, "which gives the plaintiff the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Wince*, 66 F.4th at 1040 (cleaned up). Under the holistic approach, the Court asks whether, looking at the record as a whole, "a reasonable jury could conclude that the plaintiff suffered the adverse employment action because of his membership in a protected class." *Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022) (citation omitted).

It is unclear whether Sharma wishes to proceed under both methods or only the holistic method. [*Compare* Dkt. 213 at 8–9 (noting that he need not use the *McDonnell Douglas* framework), *with id.* at 9–17 (discussing the *McDonnell Douglas* analytical steps).] Either way, the critical question is pretext. *See Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022) (stating, in the analogous Age Discrimination in Employment Act context: "[I]t is not always necessary to march through th[e] entire [*McDonnell Douglas*] process if a single issue proves to be dispositive. Here, as is often true, that issue is pretext or the lack thereof." (cleaned up)).

Pretext is often a key issue in the holistic approach, even though it is not a formal part of the analysis as it is in *McDonnell Douglas*.[11] If an employer articulates a nondiscriminatory basis for an adverse employment action, it is entitled to summary judgment unless there is a genuine dispute as to whether that reason was pretextual. *See Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) ("[I]f there is no evidence of pretext, then [the] non-discriminatory justifications for firing [the plaintiff] must be believed, which necessarily precludes liability under Title VII." (citation omitted)). Further, "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Chatman v. Bd. of Educ.*, 5 F.4th 738, 747 (7th Cir. 2021) (cleaned up); *see also Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105–06 (7th Cir. 2012) (explaining that evidence of bias does not support an inference of unlawful discrimination without evidence of a discriminatory motive).

The relevant question regarding pretext "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action." *Liu v. Cook County*, 817 F.3d 307, 316 (7th Cir. 2016) (cleaned up); *see Chatman*, 5 F.4th at 746 ("[P]retext means a lie, specifically a phony reason for some action." (cleaned up)). A plaintiff can prove pretext in several ways, including "by identifying such weaknesses, implausibilities,

---

[11]    Sharma faults Defendants for "paying lip service to the *Ortiz* holding" but "rely[ing] on nothing but pre-*Ortiz* holdings to make their pretext argument." [Dkt. 213 at 14.] He is correct that *Ortiz* clarified that "all evidence belongs in a single pile and must be evaluated as a whole," 834 F.3d at 766, but he does not explain why pre-*Ortiz* pretext cases should be disregarded; indeed, the Seventh Circuit continues to rely on them, *see, e.g.*, *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937–38 (7th Cir. 2022).

inconsistencies, or contradictions in a stated reason that a reasonable trier of fact could find it unworthy of credence." *Liu*, 817 F.3d at 316 (cleaned up). But a plaintiff cannot survive summary judgment merely by raising a dispute as to the accuracy of the reasoning behind an adverse employment action—there must be evidence from which a jury could conclude that the employer acted with an illegal discriminatory motive. *See Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("We do not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." (cleaned up)).

### 2.    Analysis

The Court begins and ends with pretext, which is dispositive here. Sharma was subjected to an adverse employment action, the 2016 notice of non-reappointment. [Dkt. 213 at 10–11; *see* Dkt. 218 at 6 (not contesting this point).] Defendants offer several arguments as to why Van Neck and Dr. Van Voorhees's decision not to reappoint Sharma was based on a nondiscriminatory justification; the Court focuses on the simplest reason: "numerous [pediatrics department] employees reported concerns about" Sharma, including "complaints of threats of physical violence." [Dkt. 195 at 12.] The Court has discussed those complaints at length above, and there is no doubt that an employer may decline to rehire an employee who has engaged in the kind of conduct Sharma's coworkers say he did. *See Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 792–93 (7th Cir. 2020) (termination for continually violating employer's policies was nondiscriminatory); *Bodenstab v. County of Cook*, 569 F.3d 651, 658–59 (7th Cir. 2009) (termination for threatening coworkers was nondiscriminatory). As the Court has explained, there is no genuine dispute Sharma's coworkers made these

complaints,[12] so the question is whether a reasonable jury could find that this reason was pretext for race or national-origin discrimination.[13]

No reasonable jury could make that finding. Sharma argues that a jury could infer pretext from Defendants' deviations from their normal processes and shifting reasons for their decision not to reappoint him. *See Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017) ("An employer's unusual deviation from standard procedures can serve as circumstantial evidence of discrimination." (citations omitted)). The deviations he identifies include Defendants sharing his May 3, 2015 request for confidential third-party intervention with individuals outside of OAE; reading his use of the phrase "mentally disturbed" to indicate he was a threat instead of "as a request for assistance and/or a cry for help"; and attempting to truncate his notice rights by entering into a separation agreement. [Dkt. 213 at 15–16.][14] As for inconsistencies,

---

[12]     Sharma classifies some of the reports as hearsay [*e.g.*, 214 ¶¶ 10 (complaints via Fanti), 22 (complaint by Jordan Henry)], but he is mistaken. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted, Fed. R. Evid. 801(c), but for the pretext inquiry "the ultimate truth of th[e] allegations" about Sharma "is immaterial," *Marshall*, 973 F.3d at 793. Defendants are not attempting to prove that Sharma actually did and said what his coworkers say he did, but rather that these reports were made to the decisionmakers did not reappoint him. *See Poullard*, 829 F.3d at 858 & n.4 (out-of-court statements were admissible for their effect on the decisionmaker's state of mind).

[13]     Sharma argues that "whether [an employer] had a legitimate, non-discriminatory reason for the [adverse employment action] is a question for the trier of fact based on the disputes in this record." [Dkt. 213 at 14 (quoting *Martin v. F.E. Moran, Inc.*, 2017 WL 1316255, at *13 (N.D. Ill. Apr. 10, 2017)).] No doubt, but here, unlike *Martin*, there is no genuine dispute that the threats Sharma is alleged to have made constitute a valid, nondiscriminatory reason not to reappoint him. *Cf.* 2017 WL 1316255, at *13 (defendant's main evidence of its nondiscriminatory reason was not dispositive of disputes).

[14]     Sharma also notes that Dr. Van Voorhees testified that he used master logs to record incidents involving other employees, but Defendants "could not produce any" in discovery. [Dkt. 213 at 16; *see* Dkt. 217 ¶ 12.] While Sharma requested Defendants produce other logs, they objected to doing so [Dkt. 233-3 at A964–66], and Sharma has provided no evidence that he moved to compel such a production. Because there is no evidence that Defendant lacked

Sharma cites differing accounts of the meetings during July 2015 and omissions and differing explanations in Defendants' EEOC position statement that he argues cloak "invidious intentions." [*Id.* at 16–17.] Even assuming Sharma is correct about these points, they have nothing to do with race or national origin. Indeed, Sharma argues that "Dr. Van Voorhees and Todd Van Neck targeted [him] because he insisted on conformity with UIC rules and regulations." [*Id.* at 14.] But pretext requires the true motive for an employer's action to be illegal discrimination, and without evidence permitting a jury to infer that motive, Sharma's claim fails even if Van Neck and Dr. Van Voorhees deviated from ordinary procedures or treated him unfairly. *See Chatman*, 5 F.4th at 747; *Brown*, 700 F.3d at 1105–06. And as discussed below, because Sharma's only evidence of race or national-origin discrimination is inadmissible, a jury could not find that illegal discrimination motivated Defendants' actions.

First, Sharma alleges that Van Neck disliked him because of his race and national origin because he didn't take Sharma's actions about the bad debt issue positively, and Sharma "believe[s] he did the same things with many other employees within the College of Medicine, people of color." [Sharma Dep. at 236, Dkt. 234-1 at A61.] Sharma did not hear Van Neck make disparaging comments about his race or national origin, but he alleges that two others—Dr. Raj and Marc Archambeau, "the chief accountant within the ambulatory administration"—reported such comments to him. [*Id.* at 238–45, Dkt. 234-1 at A62–62.] For example, Sharma testified that "Dr.

---

other logs, there is no basis to infer that Dr. Van Voorhees lied about creating the logs, which is essential for a finding of pretext. *See Chatman*, 5 F.4th at 746.

Raj mentioned numerous times that there were too many Indians in the department as was told to her again and again from the dean's office" [*id.* at 243, Dkt. 234-1 at A63] and that Archambeau said Van Neck made a statement like "this f***ing Indian … has the guts to stand up before us and making us look bad, so he should be taken out," which Dr. Raj confirmed [*id.* at 248–49, Dkt. 234-1 at A64]. While Van Neck's alleged comments are nonhearsay statements by a party opponent, Fed. R. Evid. 801(d)(2), Sharma's testimony about Dr. Raj's and Archambeau's statements must also be admissible, Fed. R. Evid. 805. Sharma has made no attempt to demonstrate that Dr. Raj and Archambeau were testifying as to matters within the scope of an agency relationship, Fed R. Evid. 801(d)(2)(D), and it is not apparent from their roles that they were. This testimony is inadmissible hearsay, which cannot be used to establish a genuine dispute at summary judgment, *Wash. Cnty. Water Co.*, 77 F.4th at 529,[15] and Sharma's speculation about Van Neck's intent is insufficient to defeat summary judgment. Sharma's speculative belief about Van Neck's reasoning is insufficient to defeat summary judgment, *see FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021).

Second, Sharma notes that Dr. Raj testified that five senior-level South Asian employees "disclosed to me their feelings that they were not treated fairly" [Raj Dep. at 67–69, Dkt. 234-2 at A454; *see* Dkt. 214 ¶ 73]; that a group of faculty, led by Dr.

---

[15]    If Dr. Raj had testified that she heard Van Neck make discriminatory comments, that testimony would be admissible, but she did not testify to any such comments. [Dkt. 214 ¶ 73.] Instead, she testified that she did not "recall anything specific" or "want to speculate" about discriminatory animus by Van Neck. [Raj Dep. at 66–67, Dkt. 234-2 at A454; *see also id.* at 117–18, Dkt. 234-2 at A466–67 (denying that Van Neck or Dean Azar indicated that Sharma was serving her poorly due to his race or national origin).]

Van Voorhees, raised concerns about Dr. Raj's management style and was the driving force behind Dr. Raj being forced to step down as Chief of Pediatrics [Raj Dep. at 105–09, Dkt. 234-2 at A463–64; *see* Dkt. 217 ¶¶ 4–5]; and that Dr. Raj filed a charge of discrimination with the EEOC [Dkt. 217 ¶ 6]. But the Court cannot consider Dr. Raj's testimony about what other senior-level employees said to her or her allegations in her EEOC complaint on hearsay grounds, and it would be too speculative to infer from complaints about her management style alone that those complaints were motivated by discriminatory animus. *See FKFJ*, 11 F.4th at 585.

Third, Sharma attempts to prove he was treated less favorably than two sets of similarly situated "non-Indian and non-Brown comparators." [Dkt. 213 at 12–14.] This is a valid way to show pretext. *See, e.g.*, *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) (*McDonnell Douglas*'s "similarly situated and pretext analysis often overlap, as comparator evidence … [is] relevant to both inquiries" (citation omitted); *Coleman v. Donahoe*, 667 F.3d 835, 852–53 (7th Cir. 2012) (in the *McDonnell Douglas* context, "a discrimination plaintiff may employ … comparator evidence to discharge her burden at the pretext stage").

> Although they need not be identically positioned, a plaintiff must show the purported comparator was directly comparable to h[im] in all material respects so as to eliminate other possible explanatory variables. Relevant factors include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications.

*Crain v. McDonough*, 63 F.4th 585, 592 (7th Cir. 2023) (cleaned up); *see also Downing v. Abbott Lab'ys*, 48 F.4th 793, 805–06 (7th Cir. 2022) (plaintiff and comparator must "have engaged in similar conduct without such differentiating or mitigating

circumstances as would distinguish their employer's treatment of them" (internal quotation omitted)). But Sharma's proposed comparators are not similarly situated to him in all material respects, so a jury could not infer race or national-origin discrimination based on differing treatment of Sharma and the other employees.

The first set of proposed comparators are two white doctors, Wayne Franklin and Krystal Revai, who Sharma argues "were treated more favorably insofar as complaints about their behavior toward others … did not result in termination." [Dkt. 213 at 12.][16] Here, too, Sharma runs into a hearsay problem. He testified that the conduct of Dr. Franklin and Dr. Revai was documented, but no such documentation appears in the record, and Sharma did not testify to firsthand knowledge of their behavior or any action Defendants took in response. [Sharma Dep. at 230–31, Dkt. 234-1 at A60.] Dr. Raj testified that she was aware of some complaints about Dr. Franklin but could not "recall specifically anything" and that she could not remember whether there were complaints about Dr. Revai, although there might have been, and she had not subjected either to an FFD evaluation. [Raj Dep. at 46–47, 54–62, Dkt. 234-2 at A449, A451–53; *see also id.* at 118–19, Dkt. 234-2 at A467 (no recollection of threatening other employes with violence or termination by Drs. Franklin and

---

[16]     Sharma discusses the alleged mistreatment Dr. Raj suffered in this section of his brief, not as a similarly situated white comparator but to bolster his argument that Indian employees were treated less favorably than white employees. [Dkt. 213 at 12.] Evidence that other members of a plaintiff's protected classes were discriminated against could help permit a jury find that the plaintiff himself suffered unlawful discrimination. *Cf. Hall v. City of Chicago*, 713 F.3d 325, 333 (7th Cir. 2013) ("If a supervisor treated all women hostilely, we generally permit an inference that the actor was motivated by their gender." (citations omitted)). But as explained above, there is no admissible evidence that Dr. Raj was discriminated against on the basis of her race or national origin.

Revai).] Without admissible evidence about their behavior or the disciplinary actions taken against them, a reasonable jury could not infer that Defendants' reasons for firing Sharma were pretextual. *See Downing*, 48 F.4th at 805–06.

The second set of comparators comprises three anonymous employees—A, B, and C—who underwent FFD evaluations after making threats and who Sharma claims received more favorable outcomes than he did. [Dkt. 217 ¶¶ 27–29.] Sharma asserts that these individuals are "non-Indian, non-Brown" employees who engaged in unprofessional, threatening behavior. [Dkt. 213 at 12.] UIC responded to these individuals' behavior "by asking what assistance it could offer to rehabilitate and assist an employe in crisis," but Sharma was offered no such assistance. [*Id.* at 12–14.] Even assuming the behavior of these employees was similar to Sharma's, they are not valid comparators because there is insufficient evidence that they were similar to Sharma in important aspects. He offers no evidence that Van Neck or Dr. Van Voorhees was involved with any disciplinary decision with respect to these employees. [*See* Dkt. 217 ¶¶ 27–29 (citing medical and UIC records that do not mention Van Neck or Dr. Van Voorhees).] Further, Dr. Marder testified without contradiction that neither employee A nor C works at the University of Illinois's Chicago campus. [Marder Dep. at 150–51, 157, Dkt. 234-1 at A427, A429.] Being subject to the same supervisor and working in the same environment are important factors for comparators, and without evidence to support these findings, a jury could

not find that employees A, B, and C were comparable in all material respects. *Crain*, 63 F.4th at 592.[17]

None of Sharma's attempts to demonstrate pretext, standing alone, permit a reasonable jury to find that Defendants' reasons for declining to reappoint him were a cover for illegal discrimination. Of course, *Ortiz* holds that "all evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d at 766. But nothing the Court has discussed thus far constitutes *any* evidence of racial or national-origin discrimination, so even in a pile, it does not amount to evidence from which a jury could reasonably conclude that the adverse employment action was because of membership in a protected class. Since "there is no evidence of pretext," the "non-discriminatory justifications" for Sharma's adverse employment actions "must be believed, which necessarily precludes liability under Title VII." *Hitchcock*, 718 F.3d at 738 (citation omitted). The Board is therefore entitled to summary judgment on Sharma's Title VII discrimination claims.

### B.    Americans with Disabilities Act

Next, the Court considers Sharma's ADA claim against the Board. The ADA prohibits employers from discriminating "on the basis of disability in regard to … discharge of employees, employee compensation, … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To succeed on this claim, Sharma must show that (1) he is disabled, (2) he is otherwise qualified for his job, and (3) he

---

[17]     Sharma does not offer a similarly situated comparator who received a larger raise when he received a 3% raise. *Cf. Crain*, 63 F.4th at 592 ("[A]t the very heart of an unequal pay claim is the plaintiff's burden to show unequal pay for *equal* work.").

suffered an adverse employment action that was (4) caused by his disability. *Brooks*, 39 F.4th at 433. "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." § 12102(1). Sharma argues that the Board regarded him as disabled [Dkt. 213 at 18–19], so among other elements, he must prove that the employer "believe[d], correctly or not, that [Sharma] ha[d] an impairment that substantially limit[ed] one or more of the major life activities," *Povey v. City of Jeffersonville*, 697 F.3d 619, 623 (7th Cir. 2012), and that he suffered an adverse employment action because of this perceived disability, *Brooks*, 39 F.4th at 433.

Even if a jury could find that the Board regarded Sharma as disabled, it could not find that it subjected him to an adverse employment action because of a perceived disability. As in Title VII, pretext is relevant to ADA claims. *See id.* at 435. The relevant adverse employment actions are subjecting Sharma to an FFD evaluation, putting him on paid leave, and declining to reappoint him.[18] If an employer "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual," and there can be no ADA liability. *See id.* (internal quotation omitted). Defendants argue that the reports that Sharma made threats of violence was a nondiscriminatory reason to place him on leave and require an FFD evaluation. [Dkt. 195 at 14–15; Dkt. 218 at 12.] The Court agrees.

---

[18]  Sharma's complaint suggests that receiving a 3% rather than 7% raise is also an adverse employment action [Dkt. 19 ¶ 217], but Sharma received this raise in 2014, well before the May 2015 emails mentioning mental disturbance and stress that Sharma contends were why the Board regarded him as disabled [*see* Dkt. 213 at 18–19].

"Preventing employees from endangering their coworkers is a business necessity: 'a safe workplace is a paradigmatic necessity of operating a business.'" *Painter v. Ill. Dep't of Transp.*, 715 F. App'x 538, 541 (7th Cir. 2017) (nonprecedential) (quoting *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir. 1995)). As explained above, there is no dispute that complaints were made about Sharma's behavior, including threats, and he described himself as mentally disturbed, which are a legitimate, nondiscriminatory reason to place Sharma on leave and require an FFD evaluation. *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) ("[I]nquiries into an employee's psychiatric health may be permissible when they reflect concern for the safety of employees ...." (citations omitted)). And Sharma's non-reappointment follows directly from the FFD and psychological evaluation findings. Drs. Marder and Friedman were unable to find Sharma fit to return to work, and relying on those medical recommendations is a valid, nondiscriminatory reason for the notice of non-reappointment. "Employers need not retain workers who, because of a disability, might harm someone; such a rule would force an employer to risk a negligence suit to avoid violating the ADA." *Painter*, 715 F. App'x at 541 (citing *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1129 (7th Cir. 2006); *Palmer v. Cir. Ct. of Cook Cnty.*, 117 F.3d 351, 352 (7th Cir. 1997)).

Sharma argues that *Painter* is distinguishable because the plaintiff there brought a claim under 42 U.S.C. § 12112(d) based on a diagnosis of paranoia, but Sharma is pursuing a regarded as disabled claim where there was no diagnosis. [Dkt. 213 at 19.] These distinctions are not dispositive. Being regarded as disabled is one

31

way to be disabled within the meaning of the ADA, § 12102(1), not a separate type of claim. And in any event, the Court does not rely on *Painter* as dictating a result on these specific facts, but rather standing for the general principle that an employer may take steps—up to and including termination—if an employee poses a threat to coworkers. 517 F. App'x at 541; *accord AIC Sec.*, 55 F.3d at 1283.

Because the Board has identified nondiscriminatory reasons for the adverse employment actions, it is entitled to summary judgment unless a jury could find that those reasons were pretextual. *Brooks*, 39 F.4th at 435; *see Hitchcock*, 718 F.3d at 738. No evidence supports such a finding. Similar to his lack of evidence of race or national-origin discrimination, Sharma identifies no statements by Defendants, Dr. Marder, Dr. Friedman, or anyone else that are suggestive of bias toward a perceived disability. Sharma argues that his non-reappointment following Drs. Marder's and Friedman's inability to make a finding as to his fitness to return to duty implies that Defendants perceived him as disabled. [Dkt. 213 at 18.] But perceiving him as disabled is only one element Sharma must prove. The possibility that Defendants regarded him as disabled does not establish that they declined to reappoint him *because of* that perceived disability, rather than because of the nondiscriminatory reason that he reportedly threatened coworkers and refused to engage with the FFD process. *See Brooks*, 39 F.4th at 435. Perhaps the doctors were mistaken about their findings and the Board inaccurately deemed Sharma as a threat, but "[p]retext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Id.* (cleaned up). A jury could not reasonably find that

Sharma was put on leave, subjected to an FFD review, and not reappointed because of discrimination against a perceived disability rather than the reported threats. Therefore, the Board is entitled to summary judgment on Sharma's ADA claim.

### C.    Equal Protection

The Court now turns to Sharma's 42 U.S.C. § 1983 equal protection claim. He alleges that he was subjected to inferior treatment because of his race and national origin. [Dkt. 19 ¶¶ 242–45.] Equal protection claims under § 1983 are subject to the same analysis as Title VII discrimination claims, *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022), and Sharma incorporates his Title VII analysis into his equal protection argument [Dkt. 213 at 20]. Thus, Sharma's equal protection claim fails for the same reasons as his Title VII claims.

Separately, Van Neck and Dr. Van Voorhees are entitled to qualified immunity on this claim. In § 1983 suits, "[q]ualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Taylor v. Town of Milford*, 10 F.4th 800, 806 (7th Cir. 2021) (cleaned up). Although qualified immunity is an affirmative defense, after it is invoked, the plaintiff has the burden to defeat it by showing that the defendants violated clearly established law. *Id.* Van Neck and Dr. Van Voorhees invoked qualified immunity [Dkt. 195 at 15–16], and in response, Sharma argued only that the evidence was disputed and that the Court must accept his version of events at summary judgment [Dkt. 213 at 22]. While true, that does not satisfy his burden of identifying a closely analogous case or clear trend in caselaw, or establishing that the constitutional violation is so obvious that a

similar case is unnecessary. *See Stockton v. Milwaukee County*, 44 F.4th 605, 620–21 (7th Cir. 2022). Van Neck and Dr. Van Voorhees are entitled to qualified immunity.

### D. State Law Claims

Finally, the Court addresses Sharma's state law claims against Dr. Van Voorhees. No party has asked the Court to relinquish supplemental jurisdiction over Sharma's state law claims if the Court grants summary judgment on his federal claims, and the Court chooses to retain jurisdiction.

> When the federal claim in a case drops out before trial, a district court usually relinquishes jurisdiction over any supplemental claim to the state courts. But judicial economy, convenience, fairness and comity may point to federal retention of state-law claims when it is absolutely clear how the pendent claims can be decided.

*Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 461 (7th Cir. 2020) (cleaned up). The interests of judicial economy, convenience, and fairness strongly counsel in favor of deciding all claims in a single forum. The parties have litigated this case for six years, built a complete evidentiary record, and fully briefed Defendants' summary judgment motion. The Court is prepared to rule on Sharma's state law claims, which it has considered alongside his federal claims.

### 1. Preemption

The Court first addresses whether, as Defendants argue, Sharma's state law claims are preempted by the Illinois Human Rights Act ("IHRA"). [Dkt. 195 at 16–17.] The IHRA preempts state law tort claims when "the core of the plaintiff's theory [i]s that the plaintiff was a victim of racial harassment." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) (cleaned up). "[I]f the [defendant's] conduct would be actionable even aside from its character as a civil rights violation because

34

the IHRA did not furnish the legal duty that the defendant was alleged to have breached, the IHRA does not preempt a state law claim seeking recovery for it." *Id.* (cleaned up). The Court agrees with Sharma that the IHRA does not preempt his claims. As Sharma points out, his claims do not rest solely on race or national-origin discrimination—he also asserts that Dr. Van Voorhees disliked him because Sharma required Dr. Van Voorhees to comply with UIC financial policies. To the extent that those allegations can support Sharma's claims, his claims are not preempted. *See Peaster v. McDonald's Corp.*, 2023 WL 5387573, at *8 (N.D. Ill. Aug. 22, 2023) (limiting the analysis to non-preempted allegations).

### 2. Tortious Interference

Sharma brings a claim for intentional interference with prospective economic advantage. To prevail, he must prove: "(1) that he had a reasonable expectation of continued employment; (2) that [Dr. Van Voorhees] knew of the expectancy; (3) that [his] intentional and unjustified interference caused the termination of the employment; and (4) damages." *Harrison v. Addington*, 955 N.E.2d 700, 708 (Ill. App. Ct. 2011) (citations omitted). This claim fails because a reasonable jury could not find that Dr. Van Voorhees intentionally and unjustifiably caused Sharma's non-reappointment.

Sharma argues that Dr. Van Voorhees interfered with his contract by "attempting to terminate it prematurely and spreading lies … culminating in subjecting him to an FFD examination and ultimate termination." [Dkt. 213 at 27.] But as discussed above regarding Sharma's inability to show pretext, the record lacks admissible evidence that Dr. Van Voorhees believed the reports about Sharma were

35

not true or that he fabricated or induced others to fabricate the reports. Sharma's best evidence in support of his argument is his testimony that Dr. Van Voorhees became "upset" when Sharma insisted on following UIC financial policies regarding travel and reimbursements. [Dkt. 217 ¶¶ 7–8; Sharma Decl. ¶¶ 5–6, Dkt. 233-2 at A916–17.] Even assuming that Sharma's testimony about Dr. Van Voorhees's state of mind is based on firsthand observation rather than speculation, that evidence alone is not enough to support a reasonable inference that Dr. Van Voorhees later rigged the FFD process to bring about the non-renewal of Sharma's contract. With no corroborating evidence about Dr. Van Voorhees's intent, that inference is too speculative to survive summary judgment. *See FKFJ*, 11 F.4th at 585 ("While we consider reasonable inferences in favor of [the nonmovant], we need not draw every conceivable inference, in its favor. A party must present more than mere speculation or conjecture to defeat a summary judgment motion." (cleaned up)). Dr. Van Voorhees is entitled to summary judgment on Sharma's tortious interference claim.

### 3.   Intentional Infliction of Emotional Distress

Finally, the Court turns to Sharma's IIED claim. To prevail on an IIED claim under Illinois law:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause *severe* emotional distress.

*Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (internal quotation omitted). To be outrageous, "the nature of the defendant's conduct must be so extreme as to go

36

beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Id.* at 80–81 (citation omitted).

Even viewing the record in Sharma's favor, a reasonable jury could not find that Dr. Van Voorhees's conduct rose to this level. Sharma argues that a jury could conclude that Dr. Van Voorhees embarked on a months-long campaign to surveil Sharma, interfere with his ability to seek mediation services, and "gaslight" Sharma by falsely claiming that Dr. Van Voorhees had counseled him. [Dkt. 213 at 27–28.][19] But "in the absence of conduct calculated to coerce an employee to do something illegal, [Illinois] courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional distress." *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999) (rejecting an IIED claim where plaintiffs alleged "they were demoted, transferred, forced to perform 'demeaning' and 'humiliating' tasks, harassed, intimidated, and threatened with termination"). A reasonable jury could not find that Dr. Van Voorhees engaged in extreme and outrageous conduct under Illinois law, so he is entitled to summary judgment on Sharma's IIED claim.

---

[19] Sharma also argues that Dr. Van Voorhees induced Hargunani and Thakar to lie about Sharma's behavior, but the evidence he cites in support of that point does not raise a genuine dispute as to whether Dr. Van Voorhees lied about this. [*See* Dkt. 214 ¶¶ 32, 39.]

**IV.    Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment [Dkt. 194] is granted. Judgment will enter in favor of Defendants and against Sharma. Civil case terminated.

Enter: 17-cv-7378
Date:  September 29, 2023

_____
Lindsay C. Jenkins
United States District Judge